**UNITED TRADE ASSOCIATES LIMITED, a foreign corporation, Plaintiff,**

**v.**

**DICKENS & MATSON (USA) LTD., INC., Alphonse J. Demots, Jr., and Michael Demots, Defendants.**

**Civ. A. No. 93–CV–71334OT.**

United States District Court, E.D. Michigan, S.D.

April 7, 1994.

754

Karen Bowman, Cincinnati, OH, Geoffrey A. Fields, Detroit, MI, for plaintiff.

Stephen R. Bernstein, Farmington Hills, MI, for defendant.

## *MEMORANDUM OPINION AND ORDER*

ANNA DIGGS TAYLOR, District Judge.

This Memorandum Opinion constitutes the findings of fact and conclusions of law of the Court, after trial to the bench. Plaintiff, United Trade Associates Limited ("UTAL"), brought this lawsuit against Defendants Dickens & Matson and Mike Demots, its owner. UTAL asserts several causes of action against Defendants: breach of contract, breach of express warranty, breach of implied warranties, fraud in the inducement, misrepresentation, breach of warranty of presentment, and fraud in the presentment.

These claims arise out of the business dealings between the Defendants and the Plaintiff which took place from 1991 to 1992.

### I.

UTAL is an international trading company based in the Ukraine, with offices in London, England. In light of the rapid changes in the former Soviet Union, UTAL executives believed that there would be an increased demand for telephones, and they sought to purchase used telephones from Western countries and resell them in the Ukraine. Dimitri Egorenkov, UTAL's authorized agent in London, contacted several different suppliers of used telephones, including a Mr. McCall, an authorized agent of Dickens & Matson.

Mike Demots, owner of Dickens & Matson, characterized the firm as a mail order business. Dickens & Matson would contact suppliers of a variety of merchandise, purchase the goods in bulk, and then resell the goods, often internationally. Occasionally, Dickens & Matson would employ purchasing agents who would locate potential suppliers. Prior to any dealings with UTAL, Dickens & Matson had employed Larry Peska, president and owner of Inter–Trading Corp., to act as a purchasing agent. Inter–Trading Corp. had located Telparts, a supplier of used telephones. Dickens & Matson purchased used phones from Telparts and later resold them in Russia. Mike Demots believed that the Russian and Ukrainian telephone systems were similar, and thus Dickens & Matson offered to sell phones to UTAL.

Egorenkov testified that he stressed to both McCall and Demots that the telephones he intended to purchase were to be used in the Ukraine and had to comply with guidelines set by the Ukrainian telephone commission. Egorenkov further testified that he informed McCall and Demots that UTAL specifically wanted two piece push button phones with all necessary cords. Dickens & Matson provided Egorenkov with two sample phones which matched the types of phones that it had previously sold in Russia. Egorenkov testified that Demots told him that the phones he planned to sell differed slight-

ly from the samples provided, but they would be substantially similar. Egorenkov testified that although the two sample phones had minor differences, they met UTAL's requirements. In addition, the Ukrainian telephone commission tested the two sample phones and concluded that they were compatible with the Ukrainian telephone network.

Believing that Dickens & Matson could meet UTAL's demands, Egorenkov drafted a contract for the purchase of 36,000 telephone sets from Dickens & Matson. The contract described the telephones as "consisting of two parts of push button dialing system, with all necessary cords, in good working and operating condition." The method of payment described in the contract required UTAL to open an irrevocable letter of credit in the amount of $135,000. After the goods left any U.S. port, Dickens & Matson would be entitled to draw down on the letter of credit once it presented the bank with documentary evidence that the telephones were shipped to the Ukraine. The contract mentions "bills of lading" and "commercial invoices" as proper documents that would authorize Dickens & Matson to draw down on the letter of credit.

The parties executed the contract on July 11, 1991, and, pursuant to the contract, UTAL applied for an irrevocable letter of credit on July 17, 1991. As required by the contract, the letter of credit permitted Dickens & Matson to draw down the full $135,-000.00 from the Bank of Chicago upon presentment of documentary evidence to the Bank of Chicago that that the goods shipped conformed to the description offered in the letter of credit. The letter of credit contained a description of the goods that was identical to the description of the goods in the contract: "telephone sets, consisting of two parts of push button dialing system with all necessary cords in working condition," and it was issued on August 27, 1991.

After the contract between UTAL and Dickens & Matson was executed and the letter of credit issued, Demots testified that he viewed the preparation of goods for shipment. Demots testified that he went to Telparts' warehouse in Lakeland Florida, and that he was present when employees of Tel-parts loaded two of the four containers with telephones. According to Demots, these large containers, the size of train boxcars, held several smaller boxes, and inside these smaller boxes were the phones.

Demots also testified that he "spot checked" some of the phones that were loaded into the containers. This check involved plugging the phones into jacks to see if they worked. According to Demots, all the phones tested were in order. In addition, Demots testified that all the phones he saw conformed to the specifications in the contract and the letter of credit.

In September of 1991, Dickens & Matson presented the relevant documents to the Bank of Chicago. These documents consisted of four sets of bills of lading, proof of insurance, and commercial invoices. All documents contained identical descriptions of the goods shipped, and these descriptions conformed to the descriptions in the contract and the letter of credit. Upon presentment, Dickens & Matson drew down the $135,000. Mike Demots testified that Dickens & Matson paid Telparts, the supplier, $80,000, and Dickens & Matson paid $18,000 to Lawrence Peska, owner of Inter–Trading Corp.

Egorenkov testified that UTAL had entered into contracts for the resale of the phones before the phones had arrived in the Ukraine, and by the time the containers had arrived in Kiev, UTAL's customers had already paid for the phones. The containers arrived in early November. However, when he and customs officials inspected the containers, they did not find two piece push button phones. Instead, Egorenkov testified that the containers held thirty to forty boxes, each containing phones packed in bulk. The boxes contained phone parts, not working phones, and many of the parts were cracked and smashed. In addition, Egorenkov testified that many of the phone parts were rotary rather than push button, and many of the phones lacked the necessary cords for operation. Finally, Egorenkov testified that none of the parts in any of containers could be put together to make a working telephone.

In addition to Egorenkov's testimony, Plaintiff also submitted photographs of the

containers that were allegedly taken by customs officials. The photographs show large piles of phone parts tangled together rather than being boxed separately. Many of the phone parts displayed appear scratched, cracked, and have rotary bases. Plaintiff also submits four certificates of examination prepared by the Ukrainian Chamber of Commerce and Industry, dated February 2, 1992; January 15, 1992; March 11, 1992; and February 24, 1992. These documents state that the contents of the four containers do not correspond to the descriptions of the goods offered in the bills of lading. Specifically, the reports state that the goods shipped consisted of broken telephone parts, many of the phone bases were rotary rather than push button systems, and most of the phones lacked the necessary cords.

On November 2, 1991, Egorenkov faxed a letter to Dickens & Matson informing them that goods inspected failed to conform to the description of goods offered in the bills of lading. The letter stated that customs officials would not release the goods because they failed to conform to the bills of lading, and asked what should be done with the cargo. The letter also promised that UTAL would send Dickens & Matson photographs of the containers and customs documents as soon as they were available.

Mike Demots responded by fax on November 2, 1991. In the letter, he states that Dickens & Matson accepts UTAL's refusal of the nonconforming cargo. Both faxes were sent to the Port of Leningrad so that the goods would be able to be shipped elsewhere. Afterwards, Dickens & Matson made several efforts to resell the goods to another party, and offered UTAL profits realized from that sale. In order to resell the goods, however, Dickens & Matson needed the original bills of lading. Dickens & Matson planned to submit the original bills of lading for new ones that would describe the goods as "telephone parts." As a result, customs officials would release the goods, and Dickens & Matson could then resell the telephone parts in Russia.

In several faxes sent during the end of November, Dickens & Matson asked UTAL for the original bills of lading, but UTAL refused to send them. In addition, Dickens & Matson asked UTAL to contact Russian companies that it thought might be interested in the telephone parts. Dickens & Matson offered to pay UTAL's expenses associated with the sale of the telephone parts. Egorenkov stated that UTAL attempted to contact some of these companies, but the companies were either uninterested or the phone numbers provided by Dickens & Matson were wrong. Egorenkov testified that rather than pay the port of Leningrad a storage fee, UTAL sent the port of Leningrad a rejection letter that renounced their rights to the goods. Egorenkov testified that he was unaware of what ultimately became of the telephone parts shipped to UTAL.

Dickens & Matson made other efforts to resolve the dispute. Egorenkov admitted that Demots offered to send a representative to the Ukraine to inspect the goods, but UTAL never followed up on this suggestion. In addition, Demots testified that he called Collin, the owner of UTAL, to find out the exact nature of UTAL's complaint, but Collin informed him that he was not interested and was on vacation.

Egorenkov also testified that Demots had discussed selling other goods to UTAL as a method of making up for the losses on the telephone deal, including the sale of cosmetics. In addition, Dickens & Matson sent Larry Peska, president of Inter–Trading, to London to meet with Egorenkov. Egorenkov testified that he met Peska in London on November 14, 1991 and voiced his complaints regarding the shipment of telephone parts, and showed Peska the photos of the nonconforming goods. According to Egorenkov, Peska was unsympathetic. However, Peska allegedly informed Egorenkov that UTAL could make its money back on the sale of cosmetics and outlined the terms of a contract for the sale of cosmetics. Egorenkov testified that his meeting with Peska failed to produce any agreement for the sale of cosmetics.

On November 19, 1991, Demots sent Egorenkov a letter that detailed more information regarding the proposed cosmetics deal. In a fax letter dated November 25, 1991,

Egorenkov informed Demots that he would be interested in the cosmetics deal, but that he would send Michael Ghasemian, a cosmetics dealer, to inspect the cosmetics before UTAL would commit to any purchase. Ghasemian flew to the United States and Demots testified that he took Ghasemian to Pavlon, a supplier of cosmetics.

Although Ghasemian was impressed with the quality of the cosmetics, in a letter dated December 5, 1991, Egorenkov informed Demots and Peska that UTAL would not enter into a cosmetics deal unless Ghasemian was present while the goods were loaded into containers. However, Ghasemian had left by the time the goods were packaged, and despite repeated offers by Demots, Egorenkov testified that he refused to enter into a cosmetics transaction with Dickens & Matson on behalf of UTAL, because his representative was not present when the goods were packaged.

Although Egorenkov testified that there was no cosmetics deal, Demots testified that Ghasemian returned to Pavlon and purchased the cosmetics. Demots admitted, however, that he was unsure if Ghasemian was purchasing the cosmetics for himself, on behalf of UTAL, or Royal Investments, another company owned by Egorenkov. Finally, Demots did not testify that he believed that Dickens & Matson and UTAL had entered into a formal contract, but that there was an understanding, and that UTAL had "gone around me," dealing with the cosmetics supplier directly.

### III.

As noted, Plaintiff alleges several causes of action against Dickens & Matson and Mike Demots. Plaintiff claims that Dickens & Matson breached its contract with UTAL, and Plaintiff has sued Mike Demots in his individual capacity, claiming that Dickens & Matson is merely Demots' alter ego. Similarly, Plaintiff alleges that Dickens & Matson breached its expressed warranty by delivering non-conforming goods. Plaintiff also claims that Dickens & Matson breached its implied warranties of correspondence, fitness, and merchantability by failing to deliver operable telephones. Plaintiff also alleges

that Dickens & Matson breached their warranty of presentment by submitting false documents to the Bank of Chicago to collect on the letter of credit.

Plaintiff also alleges several fraud based claims. Plaintiff claims that Dickens & Matson and Demots fraudulently induced UTAL to enter into the contract, and Defendants intentionally or negligently misrepresented that they would deliver conforming goods. Finally, Plaintiff alleges that Dickens & Matson and Mike Demots fraudulently presented documents to the Bank of Chicago in order to collect on the letter of credit.

In addition to terms specifying different elements of the transaction, the contract also contained the following oddly worded section:

*ARBITRATION:*

This Contract to be construed and take effect according to the Law of England, and any dispute under this contract to be settled according to the Rules and Regulations of Law of England.

After commencement of this law suit, Defendants filed a motion to dismiss, arguing that the above quoted provision required parties to settle all claims through arbitration. However, this Court denied Defendants' motion, and concluded that the section should be construed as a choice of law provision. Therefore, this Court shall analyze claims arising under the contract according to English law.

### A. Contract Based Claims

According to the English law of contract, it is the duty of the seller to deliver the goods in accordance with the terms of the contract of sale. Sale of Goods Act of 1979 § 27. If a term in a contract constitutes a substantial ingredient in identifying the thing sold, it is a "condition." **41 Halsbury's Laws 619 (4th ed. 1993).** The effect of breaching a condition expressed in the contract or implied by statute is that the innocent party can rescind the contract. Thus the innocent party is excused from performance and can sue for damages. **Anson's Law of Contract 112 (26th ed. 1984).**

In contrast, when a party breaches a term in the contract that is relatively unim-

portant, English courts label the action a breach of a warranty. *Bettini v. Gye*, (1876), 1 Q.B.D. 183. A breach of a warranty entitles the innocent party to maintain an action for damages, but the innocent party is not excused from performance. **Anson's Law of Contract 119 (26th ed. 1984).** The test to determine whether a breach of a term in a contract amounts to a breach of a condition rather than a breach of a warranty is whether the innocent party is deprived of the benefit it bargained for when it entered into the contract. *Torvald Klaveness v. ARNI v. Maritime Corporation (the "Gregos")*, (1993) 2 Lloyd's Rep. 335.

■ The shipment of nonconforming goods by Dickens & Matson clearly breached the contract. Furthermore, Dickens & Matson's action of shipping unusable and damaged phone parts amounted to a breach of an express condition of the contract. UTAL's purpose for entering into the contract was to sell phones that could function in the Ukraine. Based on the evidence of record, the goods that arrived in the Ukraine did not work. When confronted with this evidence, even Mike Demots admitted that the telephone parts displayed in the photographs did not conform with the specifications of the contract. Demots also conceded that the description of the goods offered in the customs report did not match with the description of the goods contained in the contract. UTAL was deprived of the benefit it sought when it entered into the contract. Thus, Dickens & Matson's actions amounted to a breach of an express condition of the contract.

■ In addition to breaching an express condition of the contract, Dickens & Matson is liable for breaching the implied conditions of the contract. By shipping broken telephone parts rather than two piece push button telephones, Dickens & Matson clearly breached the implied condition of correspondence with description. *Bowes v. Shand*, (1877) 2 App.Cas. 455, 480 ("if you contract to sell peas, you cannot oblige a party to take beans"). The goods shipped differed from the description included in the contract and the letter of credit so extensively that customs officials refused to release the goods.

■ Furthermore, Dickens & Matson breached the implied condition of merchantability because, based on the description of the goods offered in the contract, it is a reasonable expectation that the telephones would work. *See* Sale of Goods Act 1979 § 14(2); *Rogers v. Parish (Scarborough) Ltd.*, (1987) 2 All E.R. 232. Finally, Dickens & Matson breached the implied condition of fitness for a particular purpose because UTAL informed Dickens & Matson of its purpose to sell working telephones in the Ukraine, and the goods shipped were not fit for that purpose. *See* Sale of Goods Act 1979 § 14(3); *Wormell v. RHM Agriculture (East) Ltd.*, (1987) 3 All E.R. 75.

■ Defendants do not contradict Plaintiff's assertion that the shipment of telephone parts breached the contract, but they argue that there was an accord and satisfaction. Accord and satisfaction is the purchase of a release from an obligation by means of valuable consideration other than performance of the original obligation. *British Russian Gazette and Trade Outlook, Ltd. v. Associated Newspapers, Ltd.*, 1933 2 K.B. 616. Similar to American law, the accord is the agreement by which the obligation is discharged, and the satisfaction is the consideration that makes the agreement operative. Anson's Law of Contract 98 (26th ed. 1984). Although English courts have occasionally discharged an obligation without proof of satisfaction, establishing the existence of an accord is still required. *Green v. Rosen* 1955 1 W.L.R. 741; *Good v. Cheesman* (1831) 2 B. & Ad. 328. An accord is a type of contract; and to form an accord parties must not only reach an agreement, but they must also agree that the new contract will discharge the existing obligation. Anson's Law of Contract 98 (26th ed. 1984).

■ Given this standard, the great weight of the credible evidence does not support a finding that the negotiations surrounding a possible cosmetics transaction formed an accord. Egorenkov testified UTAL never reached an agreement with Dickens & Matson regarding the sale of cosmetics because his agent, Mike Ghasemian, was not present while the cosmetics were prepared for ship-

ping. This assertion is supported by his November 25 and December 5 faxes that state that Ghasemian must be present while the goods were loaded.

Although Mike Demots testified that Ghasemian later purchased cosmetics from the supplier, Pavlon, Mike Demots also admitted that he did not know whether Ghasemian purchased the cosmetics on behalf of UTAL, Royal Investments, or even for himself. Furthermore, Mike Demots testified that the cosmetics were purchased "around me," which contradicts Defendants' assertion that they entered into a contract with UTAL. Demots sent several faxes during the period between December 5 and 10, 1991 in which he repeatedly offered to sell UTAL cosmetics. However, Defendants fail to produce any document that evidence a mutual understanding between the two parties. These facts compel the Court to conclude that no accord was ever reached between Dickens & Matson and UTAL.

 UTAL also alleges that Dickens & Matson submitted materially inaccurate documents to the Bank of Chicago when it drew down on the letter of credit, and this constitutes a "breach of warranty of presentment." Unlike its claim of fraud in the presentment, this claim does not include scienter as an element of the offense. If this Court was free to analyze the claim under American law, it could be characterized as a violation of Section 5–111(1) of the Uniform Commercial Code which states that when a beneficiary presents documents to collect on a letter of credit, the beneficiary warrants that all the necessary provisions of the letter of credit have been satisfied. Thus, the provision allows a plaintiff to sue a beneficiary for submitting false certificates without having to satisfy the burdensome requirements of proving fraud. *Banque Paribas v. Hamilton Industries International, Inc.,* 767 F.2d 380 (7th Cir.1985); *Sun Marine Terminals, Inc. v. Artoc Bank & Trust, Ltd.,* 797 S.W.2d 7 (Tex.1990).

 The British legal system has created a similar cause of action, but it is rooted in case law rather than statutes. In *Kwei Tek Chao v. British Traders and Shippers, Ltd.,* (1954) 2 QB 459, the Court held that c.i.f.

("costs, insurance and freight") contracts place a number of obligations on the seller, some of which relate to the goods shipped and others relate to the documents presented. When presenting bills of lading, the seller is under the an obligation to present bills that conform with the description of goods set forth in the contract and present bills that are accurate.

Thus, the court in *Kwei* concluded that a shipment of nonconforming goods in a c.i.f. contract can thus lead to two possible breaches. Obviously, the shipment of nonconforming goods will breach a contract. Further, presentment of the bills of lading may result in a second breach. If the bills are accurate, then their description of the goods will not conform to the contract, and the presentation of those documents will breach the contract. Conversely, if the seller presents bills that erroneously describe the goods as conforming, presentation of those documents will also breach the contract.

As the evidence in this case demonstrates, the contract between UTAL and Dickens & Matson was also a c.i.f. contract that required Dickens & Matson to present documents to collect on the letter of credit. Dickens & Matson presented erroneous documents that stated that the goods shipped conformed to the terms of the contract. As a result, Dickens & Matson breached an obligation of the contract, which Plaintiff labels a warranty of presentment. It is important to note, however, that a finding of liability on this claim has no bearing on Plaintiff's related claim that Dickens & Matson knowingly presented false documents with the intent of improperly acquiring money set aside in the letter of credit.

 In addition to suing Dickens & Matson for breach of contract, UTAL has also sued Mike Demots individually, alleging that Dickens & Matson is merely an alter ego of Mike Demots. Although the choice of law clause directs this Court to interpret the contractual dispute under English law, the issue of piercing the corporate veil is collateral to the contract, and thus this Court is not bound by the choice of law provision.

The Sixth Circuit in *Laborers' Pension Trust v. Weinberger Homes, Inc.*, 872 F.2d 702, 704–705 (6th Cir.1988) articulated some factors considered in disregarding the corporate form including:

> (1) the amount of respect given to the separate entity of the corporation by its shareholders; (2) the degree of injustice visited on the litigants by recognition of the corporate entity; and (3) the fraudulent intent of the incorporators. [ ] Factors to be considered include undercapitalization of the corporation, the maintenance of separate books, the separation of corporate and individual finances, the use of the corporation to support fraud or illegality, the honoring of corporate formalities, and whether the corporation is merely a sham.

*Id.* at 704–705. The Sixth Circuit expounded on these criteria, and offered circumstances that would permit the piercing of the corporate veil:

> (a) a corporation and shareholders have complete identity of interests; (b) the corporation is a mere instrumentality of the shareholders; (c) the corporation is a device to avoid a legal obligation; or (d) the corporation is used to defeat public convenience, justify a wrong, protect fraud or defend a crime.

*Bodenhamer Building Corp. v. Architectural Research Corp.*, 873 F.2d 109, 112 (6th Cir. 1989). This list of circumstances is not an exhaustive one, and ultimately, the determination should be based on the facts of each case. *Id.* at 112.

Plaintiff argues that the corporate veil should be pierced because Defendants did not observe the corporate formalities. Specifically, Plaintiff alleges that Mike Demots failed to sign copies of the articles of incorporation or annual meeting minutes, and the minutes of the annual meetings fail to reflect any business transactions. Plaintiff also alleges that Dickens & Matson's corporate charter was automatically revoked on May 15, 1989, and was not reinstated until July 10, 1991. Demots neither confirmed nor denied these allegations, but he did state that during the period of 1987 through 1993, Dickens & Matson operated profitably and paid all required taxes.

Upon review, this Court concludes that these mere allegations fail to provide the requisite quantum of evidence needed to justify piercing the corporate veil. According to Michigan law "the general principle ... is [that] separate corporate identities will be respected, and thus corporate veils will be pierced only to prevent fraud or injustice." *Bodenhamer*, 873 F.2d at 111, *citing Wodogaza v. H & R Terminals*, 161 Mich.App. 746, 411 N.W.2d 848, 852 (1987). As the subsequent analysis will demonstrate, UTAL has failed to prove fraud. UTAL has also failed to sufficiently prove that there is an identity of interest. Lacking this type of evidence, the Court must dismiss this claim.

■ Although this Court is not bound to analyze the issue of piercing the corporate veil under English law, it would nevertheless reach the same conclusion if English law were applied. Unlike American law, English case law does not provide an enumerated set of factors that a court can evaluate in deciding whether to lift the corporate veil. Rather, English courts will lift the corporate veil of limited liability only when the corporate form is employed for the purposes of fraud or as a device to evade contractual or other legal obligations. *Creasey v. Breachwood Motors Ltd,* (1993) BCLC 480. Likewise, another court held: "it is appropriate to pierce the corporate veil only where special circumstances exist indicating that this is a mere facade concealing the true facts." *DHN Food Distributors v. Tower Hamlets London Borough Council,* (1978) 3 All E.R. 462. Under this stricter standard, this Court is once again compelled to find that Demots is not personally liable for Dickens & Matson's breaches.

**B. Fraud Based Claims**

■ UTAL alleges several fraud based claims against Dickens & Matson, and against Mike Demots acting as an agent of Dickens & Matson. English law permits holding an agent personally liable for fraudulent misrepresentations and negligent misrepresentations made on behalf of the principal. *See* Halsbury's Laws 668 (4th ed. 1987). Under English law, for civil cases the stan-

dard for proof of fraud is "the balance of probability." *Hornal v. Neuberger Products Ltd.*, 1956 3 All E.R.

■ To prove fraud in the inducement, Plaintiff must show that defendants knowingly or recklessly made material representations which were false, and had the object and result of inducing the other party to enter into the contract. *Lonrho plc v. Fayed*, 1991 4 ALL E.R. 961. Similarly, Plaintiff contends that Dickens & Matson's presentment of the bills of lading and invoices to the Bank of Chicago constitutes fraud in the presentment. To prove an allegation of fraud in the presentment, the plaintiff must prove that the defendant knowingly or recklessly submitted materially false documents that had the object and result of causing the Bank of Chicago to rely on those documents in releasing payment. *Derry v. Peek* (1889) 14 App.Cas. 337.

■ The Court must dismiss Plaintiff's two fraud based claims. Although UTAL proved that Defendants breached the contract, UTAL has failed to present any evidence that Mike Demots fraudulently induced UTAL to enter into the contract. Furthermore, Demots testified that prior to this transaction, he had shipped phones purchased from Telparts to Russia, and those phones had worked in Russia. This strongly undercuts Plaintiff's claim that Defendants entered into this transaction with the intent to defraud. Finally, Egorenkov admitted that Mike Demots informed him that the goods shipped would slightly differ from the two samples that Egorenkov inspected in London. Thus, total conformity was never expected. This lack of evidence to support the Plaintiff's assertion, as well as the evidence that contradicts it, compels this Court to deny Plaintiff's claim of fraud in the inducement.

■ For similar reasons, this Court must deny Plaintiff's claim of fraud in the presentment. To establish this claim, Plaintiff must demonstrate that at the time Dickens & Matson presented the documents to the Bank of Chicago, Mike Demots knew or recklessly disregarded that the information contained in the documents was false. However, Plaintiff has failed to produce any evidence to support this claim. Furthermore, Mike Demots testified that he travelled to Telparts' warehouse, and he witnessed the packaging of goods to be shipped. Demots' testimony that the goods he saw being loaded conformed with the specifications of the contract stands unrebutted. Thus, the fraud in the presentment claim also lacks foundation.

Actions taken by Mike Demots and Dickens & Matson after the breach also contradict any allegations of fraud. The evidence shows that Dickens & Matson attempted to remedy the problem by several different methods including sending a representative to the Ukraine to inspect the goods, trying to resell the goods for UTAL's profit, trying to contact the owner of UTAL, and offering to sell UTAL other goods at a deep discount. All these efforts proved unsuccessful, due in large part to UTAL's intransigence. Egorenkov testified that he refused to turn over the bills of lading because he feared losing title to the goods shipped. However, UTAL rejected the goods and Egorenkov testified that he thought the goods were worthless.

Demots did admit that he never brought suit against Telparts, and this inaction does imply that Dickens & Matson and Telparts might have been conspirators in a scheme to defraud UTAL. However, Dickens & Matson's inaction stemmed from UTAL's refusal to provide Dickens & Matson with any conclusive evidence that the goods sent did not conform to the contract. Mike Demots testified that he had not seen the photographs of the telephone parts or the reports prepared by customs officials until trial. This evidence reinforces this Court's conclusion that the two fraud based claims must be denied.

Although Plaintiff's fraud claims are denied, Plaintiff alleges that Defendants' actions at least amount to negligent misrepresentation. Specifically, UTAL alleges that Dickens & Matson made material misrepresentations regarding terms of the contract, and both Defendants are liable for misrepresentations made in documents used to draw down on the letter of credit. Plaintiff brings two related claims of misrepresentation, negligent misrepresentation and innocent misrepresentation.

762

The claim of negligent misrepresentation is a product of case law, and permits the plaintiff to sue for damages as well as rescission. *Hedley Byrne & Co. Ltd. v. Heller & Partner Ltd.*, (1964) AC 465. If a party, which has or claims to have special knowledge or skills, makes a representation with the intention of inducing another to enter into a contract, that party is under a duty to use reasonable care to see that the representation is correct. *Esso Petroleum Co. Ltd. v. Mardon*, (1976) 2 All E.R. 5, 16. If that party negligently gives misleading information, and thereby induces the innocent party to contract with him, the negligent party is liable under a theory of negligent misrepresentation. *Id.*

In addition to a claim of misrepresentation based on case law, Plaintiff also alleges that Defendants' actions constituted "innocent misrepresentation" as defined in the Misrepresentation Act of 1967. To state a claim for innocent misrepresentation under the Misrepresentation Act of 1967, Plaintiff must prove:

a person has entered into a contract after a misrepresentation has been made to him by another party thereto and as a result thereof he has suffered loss, then, if that person making the misrepresentation would be liable in damages in respect thereof had the misrepresentation been made fraudulently, that person shall be so liable notwithstanding that the misrepresentation was not made fraudulently, unless he proves that he had reasonable grounds to believe and did believe up to the time the contract was made that the facts represented were true.

Section 2(1) Misrepresentation Act of 1967. Despite their different origins, the standard of liability under negligent misrepresentation and innocent misrepresentation appear similar. If a defendant can demonstrate that he exercised due care in making a representation, and that he was nevertheless unaware of the falsity of a representation, then Defendant would avoid either claim. Anson's Law of Contract 220 (26th ed. 1984)

As the prior analysis of the fraud claims demonstrates, Defendants' conduct defeats both misrepresentation claims.

Plaintiffs have failed to provide this Court with any evidence that at the time the parties entered into the contract, Defendants should have known that they could not supply conforming goods. Moreover, Mike Demots testified that he believed that he could supply phones that met UTAL's needs, and Defendants had already sold phones from Telparts in Russia. This evidence supports a finding that Defendants believed and had a reasonable basis to believe that the representations made were true. Therefore, Plaintiff's misrepresentation claims regarding terms in the contract must be dismissed.

Similarly, Mike Demots testified that he saw and tested some phones being loaded into containers in Florida, and he believed that they conformed with the specifications of the contract. The decision to view and inspect only a portion of the thirty-five thousand phones was not negligent and formed a reasonable basis for Mike Demots' honest belief that the goods conformed. Thus, Defendants presentation of documents to draw down on the letter of credit is not actionable under a theory of negligent or innocent misrepresentation.

IV.

Based on this Court's finding that Dickens & Matson breached the contract; its express warranty to deliver goods that conformed with the terms of the contract; its implied warranties of correspondence, fitness, and merchantability; and its warranty of presentment, this UTAL is awarded damages in the sum of $135,000 against Dickens & Matson. As against Mike Demots, however, the complaint is dismissed.

SO ORDERED.