In re Michael G. TYSON,
Debtor (Three cases).

Nos. 09 Civ. 9966(DLC), 09 Civ. 9967(DLC), 10 Civ. 313(DLC).

United States District Court, S.D. New York.

July 26, 2010.

J. Bruce Miller, Norma C. Miller, J. Bruce Miller Law Group, Louisville, KY, for Chris Webb and Straight–Out Promotions, LLC.

Howard Karasik, Sherman, Citron & Karasik, P.C., New York, NY, for Frank Warren.

Jethro M. Eisenstein, Profeta & Eisenstein, New York, NY, for Edward Simons.

Robert J. Feinstein, Alan J. Kornfeld, Beth E. Levine, Pachulski Stang Ziehl & Jones LLP, New York, NY, for R. Todd Neilson, Plan Administrator.

OPINION & ORDER

DENISE COTE, District Judge:

*TABLE OF CONTENTS*

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .72
 I. Tyson's Bankruptcy Petition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .72
 II. Pre–Fight Contract Negotiations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .73
 III. The July 26 Assignment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .74
 IV. Breach of the July 26 Assignment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .75
 V. Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .75

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .76
 I. Jurisdiction and Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .76
 II. Warren's and Simons' Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .78

A. Principles of Determining Foreign Law ...............................78
B. Piercing the Veil Under English Law ...............................79
 1. The Veil of Incorporation ........................................79
 2. Survey of English Law ..........................................81
 3. Principles of English Law........................................86
C. Factual Findings on Veil–Piercing Claim ...........................90
D. Application of English Law ........................................93
E. Plaintiff's Fraud and Unjust Enrichment Claims .........................95
F. Warren's Claim for Attorney's Fees ...................................95
III. Kentucky Defendants' Appeal ..........................................97
 A. Kentucky Default Judgment ........................................97
 1. Facts and Procedural History ......................................97
 2. Analysis ........................................................99
 B. Rule 15(b)(2) & Rule 54 Motions.....................................100
 C. Attorney's Fees ................................................101

CONCLUSION ......................................................101

These three bankruptcy appeals arise out of a professional boxing match featuring bankruptcy debtor Mike Tyson ("Tyson"), a former world heavyweight champion. The principal issue on appeal is whether English law permits piercing the veil of a Gibraltar corporation, Brearly (International) Ltd. ("Brearly"), which breached its contracts with Tyson and Straight–Out Promotions, LLC ("Straight–Out") in connection with a boxing match held in Louisville, Kentucky on July 30, 2004 (the "Fight"). Following trial, the Honorable Allan L. Gropper, United States Bankruptcy Judge, concluded that appellants Frank Warren ("Warren") and Edward Simons ("Simons"), two British boxing promoters, were liable under English law for Brearly's breaches of contract. For the following reasons, the Bankruptcy Court's holding of liability on the veil-piercing claims is reversed, the judgment of the Bankruptcy Court is vacated in part, and the case is remanded for further proceedings.

## BACKGROUND

The following facts, which are undisputed unless otherwise indicated, are taken from the record on appeal, the submissions of the parties, and the Bankruptcy Court's August 19, 2009 opinion. *See Neilson v. Straight–Out Promotions, LLC (In re Tyson),* 412 B.R. 623 (Bankr.S.D.N.Y. Aug.19, 2009) ("*In re Tyson*" or the "*August 2009 Opinion*"). Only those facts relevant to the issues on appeal are discussed below.

### I. Tyson's Bankruptcy Petition

On August 1, 2003, Tyson and his wholly owned corporation, Michael Mike Tyson Enterprises Inc., each filed a voluntary petition for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court"). Their joint bankruptcy reorganization plan (the "Chapter 11 Plan")—which was filed in June 2004, confirmed in September 2004, and made effective in November 2004—created a liquidating trust (the "Liquidating Trust") and named R. Todd Neilson as plan administrator (the "Plaintiff").[1] The Chapter 11 Plan contemplated that Tyson would pay his creditors, in part, by participating in a series of boxing matches and evenly splitting the proceeds with his creditors.

---

1. Under the Chapter 11 Plan, the Plaintiff was given authority to prosecute legal claims on behalf of the Liquidating Trust, including claims for breach of post-petition contracts entered into by Tyson.

## II. Pre–Fight Contract Negotiations

In May 2004, while the Chapter 11 Plan was taking shape, Tyson's manager reached agreement with Chris Webb ("Webb") to have Tyson fight in a boxing match in Kentucky that Webb and his company, Straight–Out (collectively, the "Kentucky Defendants"), would arrange and promote. This match, the Fight, was the first in a series of bouts in which Tyson fought pursuant to his Chapter 11 Plan.

On June 10, 2004, Webb's friend, the matchmaker Sampson Lewkowicz ("Lewkowicz"), attended a promotional event in Manchester, England hosted by Sports Network, PLC ("Sports Network"), a partnership between Warren and his minority partner, Sports & Leisure Boxing, Ltd. ("Sports & Leisure").[2] At the Manchester event, Lewkowicz ran into Stephen Heath ("Heath"), an attorney for Sports Network, and began talking business. In particular, Lewkowicz asked Heath whether Warren would be interested in acquiring the international pay-per-view rights to the Fight (the "International Rights") from Straight–Out and then selling the International Rights to distributors or business partners on a country-by-country basis.

Heath got Warren on the phone, and Warren said that he was not interested in selling the International Rights.[3] After this conversation, however, Warren instructed his business partner, Simons,[4] to follow up with Lewkowicz about the possibility of arranging for Danny Williams ("Williams"), an English boxer for whom Warren acted as an agent, to be Tyson's opponent in the Fight. After Simons, Heath, and Lewkowicz met in person, Simons called Webb to propose that Tyson fight Williams and that the Kentucky Defendants sell the International Rights for $2 million.

Webb was receptive to this proposal. Direct negotiations then ensued between Webb, acting for Straight–Out, and Heath, purportedly acting for Sports & Leisure. After several weeks of negotiation, the parties reached an agreement (the "Distribution Agreement") along the following lines: (1) Tyson's opponent in the Fight would be Williams; (2) the International Rights would be assigned to Brearly, which would then coordinate the sale of the International Rights in foreign countries; (3) before the Fight, Brearly would pay Straight–Out a "minimum guaranteed compensation" of $2.7 million as an advance against Straight–Out's negotiated share of Brearly's proceeds (the "International Proceeds") from selling the International Rights; and (4) after payment of commissions and overhead, all Internation-

---

**2.** The Bankruptcy Court described Warren as "a well-known English boxing promoter with over 35 years of experience, who has promoted multimillion-dollar boxing matches around the world." *In re Tyson*, 412 B.R. at 627. The court found that "[a]s Sports Network's majority stakeholder and managing director, Warren held a tight grip over every aspect of the partnership's operations, and people in the boxing industry perceive him and Sports Network as one and the same." *Id.*

**3.** The Bankruptcy Court found that Warren did not want to deal with Tyson because the two had once been in a physical altercation. *In re Tyson*, 412 B.R. at 629 n. 6. In his

submissions on appeal, Warren concedes that he possesses "animus towards Tyson" and describes himself as a "known enemy" of Tyson.

**4.** The Bankruptcy Court found that Simons was "a veteran of the boxing business with decades of experience" who, at the time of the Fight, was also "Sports Network's chief executive officer and Warren's right-hand man." *In re Tyson*, 412 B.R. at 627. Simons also held a minority interest in Sports & Leisure and served as one of its directors. *Id.* at 627–28.

al Proceeds above $2.7 million would be split 45/45/10 among Brearly, Straight–Out, and Lewkowicz. Brearly was a Gibraltar shell company incorporated by Peter Abbey ("Abbey"), an English investor acquainted with Simons.[5] The decision to introduce Brearly into the transaction, filling the role that the parties had previously contemplated for Sports & Leisure, lies at the heart of these appeals.

On or about June 30, Heath flew to Louisville to meet with Webb and reduce the Distribution Agreement to written form. Final agreement could not be reached, however, on whether the $2.7 million minimum guarantee was to be secured by a letter of credit or deposited in an escrow account, nor on whether the forum for litigating any disputes arising under the contract would be Kentucky or Gibraltar. Nevertheless, the parties proceeded to carry out their respective tasks under the Distribution Agreement as it then existed. Beginning in mid-June and continuing until the end of July, Simons and others, acting on Brearly's behalf, sold the International Rights to distributors, broadcasters, or business partners in some three dozen countries or groups of countries throughout Europe, Asia, and Latin America.

On July 16, two weeks before the Fight, Straight–Out and Tyson signed a contract (the "Event Agreement") under which Straight–Out agreed to pay Tyson a total purse of $7.2 million and to secure that purse with a series of letters of credit before the Fight. Also on July 16, Straight–Out reached an agreement with Showtime, a premium television network, under which Showtime would broadcast the Fight in the United States and Straight–Out would pay Showtime's marketing expenses. Straight–Out was required to immediately post a $1.3 million letter of credit to secure that obligation.

### III. The July 26 Assignment

Only five days later, on July 21, the Fight was put in jeopardy when Straight–Out failed to meet certain deadlines with respect to its payment obligations. In particular, Straight–Out failed to provide Showtime its $1.3 million letter of credit and failed to provide Tyson a letter of credit for the final $1.975 million installment of his purse. According to the Kentucky Defendants, they experienced a funding shortfall only because Brearly had not yet paid Straight–Out its $2.7 million minimum guarantee under the Distribution Agreement.

On July 26, four days before the Fight, Straight–Out and Brearly reached an assignment agreement (the "July 26 Assignment") that enabled the Fight to proceed.[6] The July 26 Assignment provided that the first $1.3 million of the International Proceeds would be paid to Showtime on Straight–Out's behalf, and Warren also provided a personal guarantee that Showtime would be paid. The July 26 Assignment also assigned to Tyson certain rights to payment held by Straight–Out under the latter's Distribution Agreement with Brearly. Specifically, Tyson was guaranteed to receive at least $1.4 million (less certain "Recoupable Expenses") from Brearly in lieu of Brearly's payment to Straight–Out, but Tyson would receive up to $1.9 million, assuming available pro-

---

**5.** The facts concerning Brearly's origins and ownership are set forth in detail in Section II.D of the discussion below.

**6.** The July 26 Assignment, styled as a "Notice of Irrevocable Authority and Assignment,"

was signed by Straight–Out and Brearly alone, but Tyson's attorney Stephen Espinoza ("Espinoza") actively participated in the pertinent negotiations as Tyson's representative.

ceeds.[7] The July 26 Assignment specifically contemplated, however, that Straight–Out remained liable to Tyson for the final $1.9 million of his purse in the event that Brearly did not pay or in the event that the International Proceeds were insufficient.

## IV. Breach of the July 26 Assignment

The Fight was held as planned on July 30. Williams scored a major upset by knocking out Tyson in the fourth round. The international pay-per-view sales of the Fight, however, were disappointing. An income statement prepared by Sports Network on Brearly's behalf (the "Income Statement") showed that the International Proceeds amounted to only about $1.9 million in gross revenue, which was not enough to satisfy all of Brearly's contractual obligations. Indeed, after all overhead and fees were paid,[8] only $135,795 was available to satisfy Tyson's claim, far short of the amount guaranteed by the July 26 Assignment.[9] Brearly then failed to fulfill its obligations under the July 26 Assignment, and its counsel, Marrache, reserved Brearly's rights to object to any obligations that the July 26 Assignment purportedly placed on Brearly. Thereafter, Tyson was not paid any portion of the remaining $1.9 million of his purse by either Brearly or Straight–Out.

## V. Procedural History

On June 15, 2005, the Plaintiff initiated an adversary proceeding (the "Adversary Proceeding") in the Bankruptcy Court to pursue claims of breach of contract, unjust enrichment, and fraudulent inducement against Brearly, Warren, Straight–Out, and Webb. Warren answered the complaint on October 6, 2005, while Brearly purported to file a *pro se* answer on October 11, 2005.

The Kentucky Defendants, however, did not answer, and on May 31, 2006, a default judgment was entered against them. One year later, they moved to vacate the default judgment. By Opinion and Order of August 17, 2007, the Bankruptcy Court granted the Kentucky Defendants' motion and vacated the default judgment. *See Neilson v. Straight–Out Promotions, LLC (In re Tyson),* Adv. No. 05–02210(ALG), 2007 WL 2379624 (Bankr.S.D.N.Y. Aug.17, 2007) (the "*August 2007 Opinion*").

Meanwhile, on June 20, 2007, the Plaintiff filed an amended complaint naming additional defendants, including Simons, Sports Network, and Sports & Leisure (collectively, with Warren, the "UK Defendants"). Upon re-joining the litigation, the Kentucky Defendants asserted a cross-claim for breach of contract against Brearly and for veil-piercing against the UK Defendants. The Plaintiff's second amended complaint was filed on January 17, 2008.

Following Brearly's putative *pro se* answer in October 2005, Brearly ceased to participate in the litigation. Accordingly, a default was entered against Brearly on January 23, 2008.

A trial on the Plaintiff's claims and the Kentucky Defendants' cross-claims was held on March 23–27, 2009. On August 19,

---

7. Tyson had also been given $75,000 worth of tickets to the Fight, reducing the outstanding balance of his purse from $1.975 million to $1.9 million.

8. These amounts included the payment of $1.3 million to Showtime; a $109,746 commission to Sports Network for handling the UK sales on Brearly's behalf; and various other direct and indirect expenses, including sales commissions and attorney's fees.

9. Tyson's contractual entitlement under the July 26 Assignment worked out to approximately $1.24 million, which represents the minimum guarantee of $1.4 million less Brearly's "Recoupable Expenses."

2009, Judge Gropper held in favor of the Plaintiff on his breach of contract claims against the Kentucky Defendants and Brearly; pierced Brearly's corporate veil to hold the UK Defendants liable for Brearly's breach; and denied all other claims for relief. *In re Tyson*, 412 B.R. at 629. Following post-trial motion practice, the Bankruptcy Court entered final judgment on October 27, 2009 (the "Judgment").[10] These three bankruptcy appeals ensued and collectively became fully briefed on April 2, 2010.

## DISCUSSION

### I. Jurisdiction and Standard of Review

The parties contest on appeal whether the Adversary Proceeding fell within the Bankruptcy Court's core jurisdiction. The Plaintiff and Simons contend that the proceedings were "core," while the Kentucky Defendants and Warren contend that the proceedings were "non-core." In the alternative, Warren asserts that the Bankruptcy Court's exercise of jurisdiction in the Adversary Proceeding was unconstitutional under *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) ("*Marathon*").

■■■ "A bankruptcy court's power to enter appropriate orders and judgments in a given bankruptcy proceeding ... hinges on whether the proceeding is 'core' or 'related,' consistent with the constitutional limits that *Marathon* established." *Bankr.Servs., Inc. v. Ernst & Young (In re CBI Holding Co., Inc.)*, 529 F.3d 432,

460 (2d Cir.2008) ("*In re CBI*") (citation omitted). Core proceedings are those that are "essential or basic to the administration of a bankruptcy case." *Cent. Vt. Pub. Serv. Corp. v. Herbert*, 341 F.3d 186, 190 (2d Cir.2003). A non-exhaustive definition is set forth in 28 U.S.C. § 157(b)(2), which specifies, *inter alia*, that the bankruptcy court possesses core jurisdiction with respect to "matters concerning the administration of the estate." 28 U.S.C. § 157(b)(2)(A). This provision is broadly construed. "In crafting § 157, Congress realized that the bankruptcy court's jurisdictional reach was essential to the efficient administration of bankruptcy proceedings and intended that the 'core' jurisdiction be construed as broadly as possible subject to the constitutional limitations established in *Marathon*." *In re CBI*, 529 F.3d at 460 (citation omitted); *see also Luan Inv. S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.)*, 304 F.3d 223, 228–29 (2d Cir.2002). Section 157 provides that "[t]he bankruptcy judge shall determine ... whether a proceeding is a core proceeding under this subsection or is a proceeding that is otherwise related to a case under title 11." 28 U.S.C. § 157(b)(3).

■■■ The Adversary Proceeding fell within the Bankruptcy Court's core jurisdiction. At least two reasons for this conclusion are evident. First, proceedings to enforce a bankruptcy debtor's post-petition contracts fall within core bankruptcy jurisdiction. *See U.S. Lines, Inc. v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n, Inc. (In re U.S. Lines, Inc.)*, 197 F.3d 631, 637–

---

**10.** The Bankruptcy Court entered judgment in favor of the Plaintiff and against the following defendants in the following amounts: Straight–Out, in the amount of $1,900,000; Brearly, in the amount of $1,237,850; and Simons, Warren, Sports Network, and Sports & Leisure, each in the amount of $1,237,850. The Judgment also provides for pre- and post-judgment interest on all claims. The Judgment provides, however, that the Plaintiff's aggregate recovery from all parties may not exceed $1,900,000 plus applicable interest, and that the Plaintiff's aggregate recovery from Brearly and/or the UK Defendants may not exceed $1,237,850 plus applicable interest.

38 (2d Cir.1999) ("The bankruptcy court has core jurisdiction over claims arising from a contract formed post-petition under § 157(b)(2)(A)."); *Ben Cooper, Inc. v. Ins. Co. (In re Ben Cooper, Inc.)*, 896 F.2d 1394, 1400 (2d Cir.1990) (observing that "[t]he adjudication of [post-petition contract] claims is an essential part of administering the estate"), *vacated on other grounds*, 498 U.S. 964, 111 S.Ct. 425, 112 L.Ed.2d 408 (1990), *reinstated*, 924 F.2d 36 (2d Cir.1991).[11] Indeed, the Bankruptcy Court itself observed as much in an earlier opinion. *See August 2007 Opinion*, 2007 WL 2379624, at \*3 ("Bankruptcy courts clearly have core jurisdiction to enforce a debtor's post-petition contracts.").

■ Second, even if the Adversary Proceeding was not "core," Warren and the Kentucky Defendants did not object to the Bankruptcy Court's assumption of jurisdiction and therefore impliedly consented to the exercise of that jurisdiction. *See Universal Oil Ltd. v. Allfirst Bank (In re Millenium Seacarriers, Inc.)*, 419 F.3d 83, 98 (2d Cir.2005) ("Parties may, by their conduct, submit themselves to the bankruptcy court's jurisdiction.... [Parties who] actively litigate in the bankruptcy court without contesting personal jurisdiction can transform a non-core proceeding into a core one."); *Herbert*, 341 F.3d at 190 ("bankruptcy jurisdiction can exist" when "consented to by the parties"); *Men's Sportswear, Inc. v. Sasson Jeans, Inc. (In re Men's Sportswear, Inc.)*, 834 F.2d 1134,

1137–38 (2d Cir.1987) (concluding that a party's "failure to object to [the court's] assumption of 'core jurisdiction' at any point in th[e] extensive proceedings before the bankruptcy court ... constitutes consent to [its] final adjudication of this controversy").[12] Therefore, the Bankruptcy Court properly entered the Judgment, and this Court possesses appellate jurisdiction to review the Judgment pursuant to 28 U.S.C. § 158(a)(1).

■ The standard of review applicable to matters within core bankruptcy jurisdiction is governed by the Federal Rules of Bankruptcy Procedure. On appeal, the court "may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." Fed. R. Bankr.P. 8013. "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous...." *Id.; see Solow v. Kalikow (In re Kalikow)*, 602 F.3d 82, 91 (2d Cir.2010) (noting that "[f]indings of fact are reviewed for clear error."). Likewise, "due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Fed. R. Bankr.P. 8013; *cf. U.S. v. Iodice*, 525 F.3d 179, 185 (2d Cir.2008) (counseling "particularly strong deference" to findings based on "credibility determinations"). Although the Bankruptcy Court's findings of fact "are not conclusive on appeal, the party

---

**11.** Warren relies upon *Wood v. Wood (Matter of Wood)*, 825 F.2d 90, 97 (5th Cir.1987), for the proposition that a post-petition dispute arising under state law is not embraced within the core jurisdiction provided by 28 U.S.C. § 157. That case has been expressly disapproved in this Circuit, however. *See In re Ben Cooper, Inc.*, 896 F.2d at 1400 ("To the extent that *Wood* conflicts with our holding, we decline to follow it.").

**12.** Warren also argues that the Plaintiff failed to comply with the Bankruptcy Rules by not pleading the Bankruptcy Court's core jurisdiction in his complaint. *See* Fed. R. Bankr.P. 7008(a) ("In an adversary proceeding before a bankruptcy judge, the complaint, counterclaim, cross-claim, or third-party complaint shall contain a statement that the proceeding is core or non-core...."). Warren waived his objection on this ground, however, by impliedly consenting to the Bankruptcy Court's exercise of jurisdiction.

that seeks to overturn them bears a heavy burden," *H & C Dev. Grp., Inc. v. Miner (In re Miner),* 229 B.R. 561, 565 (2d Cir. BAP 1999), and the reviewing court must be "left with the definite and firm conviction that a mistake has been made." *ASM Capital, LP v. Ames Dep't Stores, Inc. (In re Ames Dep't Stores, Inc.),* 582 F.3d 422, 426 (2d Cir.2009). Legal conclusions of the Bankruptcy Court, however, are "reviewed *de novo.*" *In re Kalikow,* 602 F.3d at 91. Finally, mixed questions of law and fact are reviewed either "*de novo* or under the clearly erroneous standard depending on whether the question is predominantly legal or factual." *Serv. Emps. Int'l, Inc. v. Dir., Office of Workers Comp. Program,* 595 F.3d 447, 455 (2d Cir.2010) (citation omitted).

## II. Warren's and Simons' Appeal

Warren and Simons assert on appeal that the Bankruptcy Court erred in piercing Brearly's corporate veil.[13] By stipulation of all parties, the Plaintiff's and Kentucky Defendants' veil-piercing claims against Brearly are governed by English law.[14] These appeals therefore require the Court to determine the content of English law in order to resolve the disputed legal questions on appeal.

### A. Principles of Determining Foreign Law

 "Determination of a foreign country's law is an issue of law." *Itar–Tass Russian News Agency v. Russian Kurier, Inc.,* 153 F.3d 82, 92 (2d Cir.1998) ("*Itar–Tass*"). The Federal Rules of Civil Procedure provide that "[i]n determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed.R.Civ.P. 44.1. Under Rule 44.1, the court is free to conduct "[its] own research and interpretation" into the content of foreign law. *Ackermann v. Levine,* 788 F.2d 830, 838 n. 7 (2d Cir.1986); *see also In re Magnetic Audiotape Antitrust Litig.,* 334 F.3d 204, 209 (2d Cir.2003) (per curiam); *Bartsch v. Metro–Goldwyn–Mayer, Inc.,* 391 F.2d 150, 155 n. 3 (2d Cir.1968). " '[A]ppellate courts, as well as trial courts, may find and apply foreign law,' " *Itar–Tass,* 153 F.3d at 92 (quoting *Curley v. AMR Corp.,* 153 F.3d 5, 12 (2d Cir.1998)), and the Court of Appeals has "urge[d] district courts to invoke the flexible provisions of Rule 44.1 to determine issues relating to the law of foreign nations." *Curley,* 153 F.3d at 13. Although a court may "enlist the parties in th[e] effort" to determine foreign law, "[u]ltimately, the responsibility for correctly identifying and applying foreign law rests with the court." *Rationis Enters. Inc. of Panama v. Hyundai Mipo Dockyard Co., Ltd.,* 426 F.3d 580, 586 (2d Cir.2005).

 The parties have not offered expert testimony concerning the content of English law at any point during the instant litigation, nor were they required to do

---

**13.** On appeal, both Warren and Simons contest not only the availability of veil-piercing in general, but the sufficiency of the Bankruptcy Court's fact-finding as to each of them individually. Because the Bankruptcy Court's decision to pierce the veil is reversed on general grounds, the Court need not reach the latter question.

**14.** Brearly was incorporated in Gibraltar, a self-governing overseas dependency of the United Kingdom. Courts regularly look to English law in ascertaining the law of Gibraltar, *see, e.g., Carbotrade S.p.A. v. Bureau Veritas,* 99 F.3d 86, 89 (2d Cir.1996), and the parties have stipulated to doing so here. *See also* English Law (Application) Act, Act No. 1962–17 § 2(1) (Gib.) (providing, in pertinent part, that "[t]he common law and the rules of equity from time to time in force in England shall be in force in Gibraltar").

so.[15] Accordingly, the Court considers the authorities cited by the parties on appeal, the authorities relied upon by the Bankruptcy Court, and the Court's independent investigation of relevant primary and secondary authorities. Because "[t]he court's determination [of foreign law] must be treated as a ruling on a question of law," the Bankruptcy Court's conclusions of English law are reviewed *de novo*. Fed. R.Civ.P. 44.1; *see Nordwind v. Rowland*, 584 F.3d 420, 429 (2d Cir.2009).

### B. Piercing the Veil Under English Law

#### 1. The Veil of Incorporation

Under English law, a corporation is a separate legal entity from its directors, officers, members, shareholders, or other controlling parties. This principle was definitively established in the case of *Salomon v. A. Salomon & Co., Ltd.*, [1897] A.C. 22 (H.L.).[16] In that case, the creditors of a shoe-making business operated by Aron Salomon sought to establish that his company was "a myth and a fiction," "a mere scheme," or "only an 'alias' " in order to require Salomon to pay the debts of his company, which had become insolvent. *Id.* at 31–32, 42. The Court of Appeal, which is England's intermediate appellate court, ruled in favor of Salomon's creditors, accepting "the[ir] proposition that the formation of [Salomon's] company and all that followed on it were a mere scheme to enable the appellant to carry on business in the name of the company, with limited liability, contrary to the true intent and meaning of the Companies Act, 1862." *Id.* at 43 (Lord Herschell).

On further appeal, the House of Lords unanimously reversed the Court of Appeal in a landmark *seriatim* opinion that continues to be widely cited.[17] Lord Macnaghten's speech has become the key passage:

> The company is at law a different person altogether from the subscribers to the memorandum [of incorporation]; and,

---

**15.** Several courts have cautioned against undue reliance on the testimony of experts in determining foreign law. *See, e.g., Sunstar, Inc. v. Alberto–Culver Co.*, 586 F.3d 487, 495 (7th Cir.2009) (describing "articles, treatises, and judicial opinions" as "superior sources" of foreign law compared with the testimony of experts, who are often "selected on the basis of the convergence of their views with the litigating position of the client"); *Itar–Tass*, 153 F.3d at 92 (observing that a court determining foreign law should consider "not the credibility of the experts," but rather, "the persuasive force of the opinions they express[ ]").

**16.** Citations for English cases in this Opinion are given in modified Bluebook format. The following case. reporter abbreviations are used: "A.C." for The Law Reports, Appeal Cases; "Ch." for The Law Reports, Chancery Division; "Q.B." for The Law Reports, Queen's Bench Division; "All E.R." for All England Reports; "S.C.(H.L.)" for Session Cases (House of Lords); "W.L.R." for The Weekly Law Reports; "S.L.T." for Scots Law Times; "B.C.C." for British Company Cases;

and "B.C.L.C." for Butterworth's Company Law Cases. For cases since 2001, the following neutral citation forms are used: "EWCA Civ" for the Court of Appeal of England and Wales (Civil Division); "EWCA Crim" for the Court of Appeal of England and Wales (Criminal Division); and "EWHC" for the High Court of England and Wales. To designate the court rendering each decision, the following abbreviations are given parenthetically the first time a case is cited: "H.L." for House of Lords; "C.A." for Court of Appeal; "Ch." for the High Court Chancery Division; "Q.B.D." or "K.B.D." for the High Court Queen's/King's Bench Division; and "Fam." for the High Court Family Division. Bracketed dates in citations for pre–2001 cases reflect the year a case was published, not the year it was decided.

**17.** *See, e.g., Yukong Line Ltd. of Korea v. Rendsburg Invs. Corp. of Liberia (The Rialto)*, [1998] 1 W.L.R. 294, 303 (Q.B.D.) (Toulson, J.) ("*Yukong* ") (relying on *Salomon* for the proposition that "a limited company has a legal existence independent of its members and is not the agent of its members").

though it may be that after incorporation the business is precisely the same as it was before, and the same persons are managers, and the same hands receive the profits, the company is not in law the agent of the subscribers or trustee for them. Nor are the subscribers as members liable, in any shape or form, except to the extent and in the manner provided by the [Companies] Act. That is, I think, the declared intention of the enactment.

*Id.* at 51. The four other Law Lords who heard the case concurred with the same reasoning.[18] Moreover, the Law Lords made clear that their reasoning applied with equal force even to the putative "one-man company." *See, e.g., id.* at 44 (Lord Herschell) ("It is said that the respondent company is a 'one-man' company. . . . [But] I am unable to see how it can be lawful for three or four or six persons to form a company for the purpose of . . . limited liability, and not for one person to do so. . . .").

Notwithstanding the *Salomon* principle, English courts do recognize that the veil of incorporation may be pierced, or "lifted," [19] under certain circumstances,[20] as *Salomon* itself suggested. *See, e.g., id.* at 33 (Lord Herschell) (implying that, if Salomon had used his company to commit fraud, the result would have been different). The parties agree on appeal with the Bankruptcy Court's articulation that, under English law, the corporate veil " 'may be pierced only in extremely limited circumstances' " and that " '[i]n order for the veil to be pierced, the corporate structure must have been devised as a mere facade concealing true facts.' " *In re Tyson,* 412 B.R. at 640 (quoting UK Defendants' Post–Trial Memorandum of Law).

Nevertheless, the parties vigorously disagree as to how that general statement of

18. *See* [1897] A.C. at 30–31 (Lord Halsbury L.C.) ("[I]t seems to me impossible to dispute that once the company is legally incorporated it must be treated like any other independent person with its rights and liabilities appropriate to itself . . . . whatever may have been the ideas or schemes of those who brought it into existence."); *id.* at 42 (Lord Herschell) ("I am at a loss to understand what is meant by saying that [the company] is but an 'alias' for A. Salomon. It is not another name for the same person; the company is ex hypothesi a distinct legal persona."); *id.* at 54 (Lord Morris) (concurring generally); *id.* at 56 (Lord Davey) (finding Salomon not liable because his company was a "duly formed legal persona").

19. At least one court has distinguished between "piercing" and "lifting" according to the purpose for which corporate personality is disregarded. *See Atlas Mar. Co. S.A. v. Avalon Mar. Ltd. (The Coral Rose),* [1991] 4 All E.R. 769, 779 (C.A.) (Staughton, L.J.) (*"Atlas"*) ("To *pierce* the corporate veil is an expression that I would reserve for treating the rights and liabilities or activities of a company as the rights or liabilities or activities of its shareholders. To *lift* the corporate veil or *look behind* it, on the other hand,

should mean to have regard to the shareholding in a company for some [other] legal purpose."). Nevertheless, this Opinion follows the more common practice of using these two terms interchangeably.

20. This Opinion discusses only judicial veil-piercing, and therefore, does not consider circumstances in which disregard of the corporate form is authorized or required by statute. *See, e.g.,* Insolvency Act 1986 (c. 45) § 213 (individual liability to the bankruptcy estate for debts of insolvent company where "fraudulent trading" has occurred during the winding-up process); *id.* § 214 (same for "wrongful trading," wherein individual "knew or ought to have concluded that there was no reasonable prospect that the company would avoid going into insolvent liquidation"); Companies Act 2006 (c. 46) § 993(1) ("If any business of a company is carried on with intent to defraud creditors of the company or creditors of any other person, or for any fraudulent purpose, every person who is knowingly a party to the carrying on of the business in that manner commits a[ ] [criminal] offence.").

law applies to the facts of this case. The Bankruptcy Court did not elaborate that general statement into a formal legal standard, if only because such standards do not appear to exist. Indeed, U.S. courts have previously noted that " '[u]nlike American law, English case law does not provide an enumerated set of factors that a court can evaluate in deciding whether to lift the corporate veil.' " *Gabriel Capital, L.P. v. NatWest Fin., Inc.*, 122 F.Supp.2d 407, 433 n. 13 (S.D.N.Y.2000) (*"Gabriel Capital"*) (quoting *United Trade Assocs. Ltd. v. Dickens & Matson (USA) Ltd.*, 848 F.Supp. 751, 760 (E.D.Mich.1994)).[21] A resolution of these appeals requires the Court to survey English law concerning piercing the corporate veil in some detail.[22]

## 2. Survey of English Law

The earliest leading case holding that the veil of incorporation may be lifted under appropriate circumstances is *Gilford Motor Co., Ltd. v. Horne*, [1933] Ch. 935 (C.A.) (*"Gilford"*).[23] In *Gilford*, the defendant, Horne, attempted to evade his contractual obligations under a nonsolicitation agreement by forming a company to compete with Horne's former employer and actively solicit its customers. The Court of Appeal, reversing the decision below and granting the plaintiff an injunction to enforce the covenant, held *seriatim* that the injunction bound not only Horne but his company as well. Lord Justice Lawrence reasoned that "the company was a mere cloak or sham for the purpose of enabling the defendant to commit a breach

**21.** The court in *Gabriel Capital*, for its part, reiterated the general statement that " 'English law ... will pierce the corporate veil and recognize one entity as the alter ego of another only where special circumstances exist indicating that the relationship of one corporation to another is a mere facade concealing the true facts.' " *Gabriel Capital*, 122 F.Supp.2d at 433 n. 13 (quoting *Great Lakes Overseas, Inc. v. Wah Kwong Shipping Grp., Ltd.*, 990 F.2d 990, 997 (7th Cir.1993)).

**22.** The secondary sources that have been most helpful include: Georgina Andrews, *The Veil of Incorporation—Fiction or Façade?*, Bus. L.Rev., Jan. 2004, at 4 ("Andrews"); Thomas Cheng, *Piercing the Veil Across the Atlantic: A Comparative Study of the English and the U.S. Corporate Veil Doctrines* (unpublished manuscript) (2010); P.L. Davies et al., *Gower & Davies' Principles of Modern Company Law* (8th ed. 2008) ("Davies"); Gore-Browne, *Company Law Precedents* (Lord Millett et al. eds., 44th ed. 2010) ("Gore-Browne"); Simon Goulding, *Company Law* (2d ed. 1999) ("Goulding"); Andrew Hicks & S.H. Goo, *Cases & Materials on Company Law* (6th ed.2008); John Lowry & Alan Dignam, *Company Law* (2d ed. 2003) ("Lowry & Dignam"); Marc Moore, *"A Temple Built on Faulty Foundations": Piercing the Corporate Veil and the Legacy of Salomon v. Salomon*, J. Bus. L., Mar. 2006, at 180; S. Ottolenghi,

*From Peeping Behind the Corporate Veil, to Ignoring It Completely*, 53 Mod. L.Rev. 338 (1990); Jennifer Payne, *Lifting the Corporate Veil: A Reassessment of the Fraud Exception*, 56 Cambridge L.J. 284 (1997) ("Payne"); Len Sealy & Sarah Worthington, *Cases and Materials in Company Law* (8th ed. 2008) ("Sealy & Worthington"); Susan Watson, *Two Lessons from "Trustor"*, 119 L.Q. Rev. 13 (2003) ("Watson"); Peter Ziegler & Lynn Gallagher, *Lifting the Corporate Veil in the Pursuit of Justice*, J. Bus. L., July 1990, at 292. The Court has also relied upon a similar survey of English veil-piercing law contained in Justice (now Lord Justice) Munby's opinion in *Hashem v. Shayif*, [2008] EWHC 2380 (Fam.) [¶¶ 101–08, 144–221].

**23.** Earlier cases are also sometimes cited, albeit less frequently. *See Daimler Co., Ltd. v. Cont'l Tyre & Rubber Co. (Gr.Brit.), Ltd.*, [1916] 2 A.C. 307 (H.L.) (concluding that the corporate veil may be lifted to determine the nationality of a company's ownership in a time of war); *Re Darby, ex parte Brougham*, [1911] 1 K.B. 95, 101 (K.B.D.) (*"Darby"*) (holding liable the two incorporators of an insolvent Guernsey company for the company's debts, where the company was "merely an alias" for the incorporators and where the incorporators had already been convicted of fraud relating to the company's issuance of materially misleading prospectuses).

of his covenant against solicitation." *Id.* at 965 (Lawrence, L.J.). Likewise, Lord Hanworth M.R. reached the conclusion that "th[e] company was formed as a device, a stratagem, in order to mask the effective carrying on of a business of Mr. E.B. Horne. The purpose of it was to try to enable him, under what is a cloak or a sham, to engage in business ... in respect of which he had a fear that the plaintiffs might intervene and object." *Id.* at 956; *see also id.* at 969 (Romer, L.J.) ("[T]his defendant company was formed and was carrying on business merely as [a] cloak or sham for the purpose of enabling the defendant Horne to commit the breach of the covenant that he entered into deliberately with the plaintiffs . . . .").

Thirty years later, in *Jones v. Lipman,* [1962] 1 W.L.R. 832(Ch.) (Russell, J.), the Chancery Division pierced the corporate veil on facts somewhat similar to those in *Gilford.* In *Jones,* the first defendant, Lipman, contracted to sell some London property to the plaintiffs, but then changed his mind before the closing. Instead, Lipman conveyed the property to another defendant, Alamed Ltd. ("Alamed"), which was a company formed by Lipman and "under [his] complete control." *Id.* at 835. The court awarded specific performance of the sale contract not only against Lipman, but against Alamed as well, holding that "specific performance cannot be resisted by a vendor who, by his absolute ownership and control of a limited company in which the property is vested, is in a position to cause the contract to be completed." *Id.* at 835–36. Citing the Lord Justices' observations in *Gilford,* and concluding that they "appl[ied] even more

forcibly to the present case," Justice Russell declared that "[t]he defendant company is the creature of the first defendant, a device and a sham, a mask which he holds before his face in an attempt to avoid recognition by the eye of equity." *Id.* at 836. The court concluded, as a matter of principle, that "an equitable remedy is rightly to be granted directly against the creature in such circumstances." *Id.* at 836–37.

Principally based on the authority of *Gilford* and *Jones,* the English courts thereafter became increasingly amenable to granting applications to lift the corporate veil. In *Littlewoods Mail Order Stores Ltd. v. Inland Revenue Comm'rs,* [1969] 1 W.L.R. 1241 (C.A.) ("*Littlewoods* "), Lord Denning M.R. stated:

> I decline to treat the Fork Manufacturing Co. Ltd. as a separate and independent entity. The doctrine laid down in *Salomon v. Salomon & Co.* [1897] A.C. 22, has to be watched very carefully. It has often been supposed to cast a veil over the personality of a limited company through which the courts cannot see. But that is not true. The courts can and often do draw aside the veil. They can, and often do, pull off the mask. They look to see what really lies behind. . . . I think that we should look at the Fork Manufacturing Co. Ltd. and see it as it really is—the wholly-owned subsidiary of Littlewoods. It is the creature, the puppet, of Littlewoods in point of *fact:* and it should be so regarded in point of *law.*

*Id.* at 1254.[24] Likewise, in *Wallersteiner v. Moir,* [1974] 1 W.L.R. 991 (C.A.), the

---

**24.** In his separate opinion, Lord Justice Karminski observed that although "Fork and ... Littlewoods[ ] are two separate entities in law" based on "the rule in *Salomon,*" it was nevertheless "necessary here, as I think, to look at what I believe to be the realities of this

situation." *Littlewoods,* [1969] 1 W.L.R. at 1256 (Karminski, L.J.); *see Adams v. Cape Indus. Plc,* [1990] Ch. 433, 543 (C.A.) (Slade, L.J.) (observing that Lord Justices Karminski and Sachs "refrained" from adopting Lord

Court of Appeal considered the corporate personality of various foreign entities owned by an influential London businessman named Dr. Wallersteiner. Lord Denning M.R. stated:

> I am prepared to accept that the English concerns—those governed by English company law or its counterparts in Nassau or Nigeria—were distinct legal entities.... I will assume, too, that [the Liechtenstein concerns] were distinct legal entities, similar to an English limited company. Even so, I am quite clear that they were just the puppets of Dr. Wallersteiner. He controlled their every movement. Each danced to his bidding. He pulled the strings. No one else got within reach of them. Transformed into legal language, they were his agents to do as he commanded.... I am of the opinion that the court should pull aside the corporate veil and treat these concerns as being his creatures— for whose doings he should be, and is, responsible.

*Id.* at 1013 (citing *Gilford* ). *But see id.* at 1027 (Buckley, L.J.) ("[W]ith the greatest deference to Lord Denning M.R., I do not think we are justified in identifying Dr. Wallersteiner with I.F.T. [the Bahamian company] . . . on the ground that I.F.T. was merely the puppet of Dr. Wallersteiner or on any other ground.").[25]

Finally, in 1985, the Court of Appeal applied *Wallersteiner* to impose liability on an individual defendant who had created a "sophisticated and intricate network" of some eighty "interrelated English and foreign companies and foreign trusts as a mechanism through which [he] could at will dispose of his English assets." *Re a Company,* [1985] 1 B.C.C. 99421, 99425 (C.A.) (Cumming–Bruce, L.J.). The court, relying on *Wallersteiner,* declared that "the court will use its powers to pierce the corporate veil if it is necessary to achieve justice irrespective of the legal efficacy of the corporate structure under consideration." *Id.*

The extension of British veil-piercing law suggested by *Littlewoods, Wallersteiner, D.H.N., and Re a Company* was tempered, however, by a contrary tendency beginning in the late 1970s. Most importantly, in 1978, the House of Lords cautioned that it "ha[d] some doubts whether . . . the Court of Appeal [in *D.H.N.*] properly applied the principle that it is appropriate to pierce the corporate veil only where special circumstances exist indicating that [it] is a mere façade concealing the true facts."[26] *Woolfson v. Strathclyde*

---

Denning M.R.'s reasoning, thereby making it dicta ).

25. In *D.H.N. Food Distributors Ltd. v. Tower Hamlets London Borough Council,* [1976] 1 W.L.R. 852 (C.A.) ("*D.H.N.*"), Lord Denning M.R. pierced the corporate veil separating three companies in order to enable the parent company to recover "disturbance" payments (i.e., compensation for the exercise of eminent domain) on behalf of one of its subsidiaries, thereby inaugurating the "single economic entity" doctrine. As made clear by subsequent cases, however, this doctrine never gained broad support and was ultimately short-lived. *See Adams,* [1990] Ch. at 532–39.

26. This passage from *Woolfson* is widely cited as embodying the general rule on veil-piercing under English law. *See, e.g., Jennings v. Crown Prosecution Serv.,* [2008] 1 A.C. 1046, 1048 (H.L.) (citing and paraphrasing *Woolfson* ). *Woolfson* derived this statement from *Tunstall v. Steigmann,* [1962] 2 Q.B. 593 (C.A.), in which the Court of Appeal observed: "Whilst it may be argued that in the above circumstances the courts have departed from a strict observance of the principle laid down in [*Salomon* ], it is true to say that any departure, if indeed any of the instances given can be treated as a departure, has been made to deal with special circumstances when a limited company might well be a facade concealing the real facts." *Id.* at 601–02 (Ormerod, L.J.).

*Reg'l Council,* [1978] S.C.(H.L.) 90, 96 (Lord Keith of Kinkel).

In 1989, a case was decided that strongly re-asserted the *Salomon* principle and thereby cast into doubt the foregoing developments in English veil-piercing jurisprudence. That decision was *Adams v. Cape Industries Plc,* [1990] Ch. 433 (C.A.), a complex litigation involving the plaintiff's attempt to enforce in the United Kingdom a default judgment he had obtained in Texas federal court against the defendant ("Cape"), a global asbestos manufacturer and distributor. The Court of Appeal concluded that Cape had been "present" in the United States at the time of the Texas default judgment was entered only if the corporate veil between Cape and its U.S. affiliates were lifted.

After surveying the existing body of English veil-piercing cases, the court noted "one well-recognized exception to the rule prohibiting the piercing of 'the corporate veil,'" namely, "'where special circumstances exist indicating that it is a mere façade concealing the true facts.'" *Id.* at 539 (Slade, L.J.) (quoting *Woolfson,* 1978 S.C.(H.L.) at 96). The plaintiff suggested three scenarios in which he believed the *Woolfson* exception should be applied, the last being "where a defendant by the device of a corporate structure attempts to evade ... such rights of relief as third parties may in the future acquire." *Id.* at 544. The court considered whether the third condition was an accurate statement of the law, and concluded that it was not:

> As to condition (iii), we do not accept as a matter of law that the court is entitled to lift the corporate veil as against a defendant company which is the member of a corporate group merely because the corporate structure has been used so as to ensure that the legal liability (if any) in respect of particular future activities of the group (and correspondingly the

risk of enforcement of that liability) will fall on another member of the group rather than the defendant company. Whether or not this is desirable, the right to use a corporate structure in this manner is inherent in our corporate law.

*Id.* at 544. Elsewhere in his opinion—the sole opinion offered by the Court of Appeal in the case—Lord Justice Slade likewise concluded:

> If a company chooses to arrange the affairs of its group in such a way that the business carried on in a particular foreign country is the business of its subsidiary and not its own, it is, in our judgment, entitled to do so. Neither in this class of case nor in any other class of case is it open to this court to disregard the principle of *Salomon v. A. Salomon & Co. Ltd.,* [1897] A.C. 22 merely because it considers it just so to do.

*Id.* at 537. Lord Justice Slade's controlling opinion thus not only ruled that the plaintiff was not entitled to enforce his default judgment in the United Kingdom, but also sent a clear message that the English courts had strayed too far from the orthodoxy of *Salomon.*

The extent to which *Adams* would reverse course was at first unclear. Despite *Adams'* sweeping language, a lower court opinion three years later applied *Adams* narrowly. In *Creasey v. Breachwood Motors Ltd.,* [1992] B.C.C. 638 (Q.B.D.), Richard Southwell Q.C., sitting as a Deputy High Court Judge, distinguished *Adams* on its facts, observing that the case before him did not involve the defendants' intentions to structure a corporate group to shield against hypothetical liabilities in the future, but rather, "to evade responsibility for the contingent liabilities to [the plaintiff] for breach of his contract of employment" by transferring assets away from the company that had employed plaintiff, thereby rendering it judgment-proof. *Id.*

at 647. The *Creasey* court also stated that "[t]he most important factor in this case" was that the individual defendants "themselves deliberately ignored the separate corporate personalities" of their companies, thereby "disregard[ing] their duties as directors and shareholders" to the company whose assets were stripped. *Id.* at 647–48.

*Creasey*, however, was soon criticized. In *Ord v. Belhaven Pubs Ltd.*, [1998] B.C.C. 607 (C.A.), the Court of Appeal relied on *Adams* to reverse the trial court, finding that it had "disregard[ed] the distinction between the legal entities that were involved" by erroneously concluding that "since the company cannot pay, the shareholders who are the people financially interested should be made to pay instead." *Id.* at 615 (Hobhouse, L.J.). Lord Justice Hobhouse, writing for the panel, then went out of his way to address *Creasey*, which in his view had relied on "a very similar train of thought to that which was followed by the [trial] judge in the present case." *Id.* at 616. The Court of Appeal declared that *Creasey* "represents a wrong adoption of the principle of piercing the corporate veil" and that the case "should no longer be treated as authoritative." *Id.*

Nevertheless, it is clear that *Adams* has not, as a practical matter, foreclosed all judicial veil-piercing. For example, in *Trustor AB v. Smallbone*, [2001] 1 W.L.R. 1177(Ch.) (*"Trustor"*), Sir Andrew Morritt V–C pierced the corporate veil to hold liable Smallbone who, in breach of his fiduciary duty to the plaintiff corporation (for which he served as managing director), directed certain funds to be withdrawn from the corporation and transferred to a Gibraltar company, Introcom (International) Ltd., which Smallbone controlled.[27] The court held that Smallbone was personally liable for Introcom's receipt of the misappropriated funds because Smallbone had interposed Introcom as "a device or facade ... used as the vehicle for the receipt of the money" diverted from Trustor.[28] *Id.* at 1186 [¶ 25].

Despite many decades of veil-piercing jurisprudence since *Salomon*, only the highlights of which are set forth above, English courts caution that it remains difficult to determine when it is appropriate to lift the veil. In *Adams*, the Court of Appeal observed:

> From the authorities cited to us we are left with rather sparse guidance as to the principles which should guide the court in determining whether or not the arrangements of a corporate group involve a façade within the meaning of that word as used by the House of Lords in *Woolfson*, 1978 S.L.T. 159. We will not attempt a comprehensive definition of those principles.

*Adams*, [1990] Ch. at 543 (Slade, L.J.). Recent cases have expressed a certain measure of bewilderment as to the current state of the law.[29] Moreover, the meta-

---

27. In particular, Smallbone was the beneficiary of a Liechtenstein "Anstalt" entity, which in turn was the sole owner of Introcom. *Trustor*, [2001] 1 W.L.R. at 1183 [¶ 15].

28. At least one commentator has subsequently questioned whether it was necessary to pierce the veil in order to hold Smallbone liable, given his breach of fiduciary duty to the plaintiff corporation. *See* Watson at 13–17.

29. *See, e.g., Raja v. Van Hoogstraten*, [2006] EWHC 2564(Ch.) [¶ 30] (observing that English veil-piercing law "is not clear"), *aff'd*, [2008] EWCA Civ 1444; *Kensington Int'l Ltd. v. Congo*, [2005] EWHC 2684 (Q.B.D.) (*"Kensington"*) [¶ 177] (noting "a number of cases where the courts have thought it right to 'pierce the corporate veil,' although the meaning of the expression and its out-working differs in the varying contexts of the authorities concerned"); *Yukong*, [1998] 1 W.L.R. at 310 ("The cases have not worked out what is meant by 'piercing the corporate veil.' It may not always mean the same thing." (cita-

phorical language in which the holdings of *Gilford, Jones, Wallersteiner*, and similar cases are couched has exacerbated the difficulties of achieving analytical clarity. *See Yukong*, [1998] 1 W.L.R. at 305 (observing, with regard to veil-piercing, that "metaphor can be used to illustrate a principle; it may also be used as a substitute for analysis and may therefore obscure reasoning").

### 3. Principles of English Law

Bearing in mind these words of caution, some general conclusions about the current state of English veil-piercing law may be drawn. First, given *Salomon*, the fact that a person engages in the "carrying on of a business" using a duly incorporated, yet seemingly artificial, entity is not sufficient to justify piercing that entity's veil. Legal formalisms must be respected even at the risk of abiding a seeming injustice: "[S]ave in cases which turn on the wording of particular statutes or contracts, the court is not free to disregard the principle of [*Salomon* ] merely because it considers that justice so requires." *Adams*, [1990] Ch. at 536 (Slade, L.J.); *see also Hashem*, [2008] EWHC 2380 [¶ 160] ("[T]he court cannot pierce the corporate veil . . . merely because it is thought to be necessary in the interests of justice."); *Kensington*, [2005] EWHC 2684 [¶ 177] ("The authorities make it plain that the separate personality of the company cannot be ignored merely because a court considers that it might be just to do so."); *Trustor*, [2001] 1 W.L.R. at 1185 [¶ 21] (rejecting "interests of justice" approach to veil-piercing). *But see Ratiu v. Conway*, [2005] EWCA Civ 1302 (C.A.) (Auld, L.J.) [¶ 78] (arguing in favor of "lifting the corporate veil where the facts require it," when a breach of fiduciary duty has occurred). Likewise, courts may no longer have regard to the "the realities of the situation" in an attempt to align the law with economic circumstances. *Adams*, [1990] Ch. at 534.[30] Accordingly, veil piercing is quite rare under English law. *See Hashem*, [2008] EWHC 2380 [¶ 221] (noting that opportunities for veil-piercing are " 'extremely limited indeed' " and that "[r]eported cases in any context where the claim has succeeded are few in number and striking on their facts." (quoting *Ord*, [1998] B.C.C. at 615)).[31]

---

tion omitted)); *Creasey*, [1993] B.C.C. at 647 ("The [case law] authorities . . . provide only limited guidance as to the circumstances in which this power [of veil-piercing] is to be exercised."). To similar-effect, Gore–Browne has observed that "[i]t is not possible to formulate any single principle as the basis for these decisions, nor are all the decisions, as to when the separate legal entity of the company must be respected or when it may be disregarded, entirely consistent with one another." Gore–Browne ¶ 1.3.1.

**30.** *See also Adams*, [1990] Ch. at 538 (" '[Counsel] suggested beguilingly that it would be technical for us to distinguish between parent and subsidiary company in this context; economically, he said, they were one. But we are concerned not with economics but with law. The distinction between the two is, in law, fundamental and cannot be bridged.' ") (quoting *Bank of Tokyo Ltd. v.*

*Karoon*, [1987] A.C. 45, 64 (C.A.) (Goff, L. J.)); *Kensington*, [2005] EWHC 2684 [¶ 180] (noting that although "a court looks for the substance of a matter" in determining whether to pierce the corporate veil, it "looks for the legal substance, not its economic substance, if different.").

**31.** Commentators express similar caution about the usefulness or viability of the veil-piercing doctrine. *See, e.g.,* Davies at 208–09 ("The doctrine of lifting the veil plays a small role in British company law. . . . Even where the case for applying the doctrine may seem strong, as in the undercapitalised one-person company . . . the courts are unlikely to do so."); Sealy & Worthington at 53 ("The topic of 'lifting the veil' persists in company law textbooks . . . yet all the signs are that, after a brief flurry of interest some decades ago, there is now little potential for it to develop into a doctrine of any substance.").

Second, courts may "pierce the corporate veil only where special circumstances exist indicating that [it] is a mere façade concealing the true facts." *Woolfson*, 1978 S.C.(H.L.) at 96; *see Hashem*, [2008] EWHC 2380 [¶ 151] (describing *Woolfson's* "statement of principle" as "[t]he starting point" for veil-piercing analysis). In construing the *Woolfson* principle, courts observe that "an element of impropriety or dishonesty" is required to pierce the veil. *Kensington*, [2005] EWHC 2684 [¶ 178]; *see also Hashem*, [2008] EWHC 2380 [¶ 161] ("[T]he corporate veil can be pierced only if there is some 'impropriety.' "); *Ord*, [1998] B.C.C. at 615 (discussing *Adams* and stating "there must be some impropriety before the corporate veil can be pierced"). This requirement may be satisfied, in part, by evidence of the defendant's subjective intent to defraud. "Following *Jones v. Lipman*, we agree … [that] where a façade is alleged, the motive of the perpetrator may be highly material." *Adams*, [1990] Ch. at 542; *see also id.* at 540 ("In our judgment … whenever a device or sham or cloak is alleged in cases such as this, the motive of the alleged perpetrator must be legally relevant. . . .").

Nevertheless, although evidence of impropriety is necessary, it is not in itself sufficient to justify veil-piercing. "[T]he court cannot, on the other hand, pierce the corporate veil merely because the company is involved in some impropriety." *Hashem*, [2008] EWHC 2380 [¶ 162]. For ex-

ample, the fact that a "façade" company has breached a contract is not, in itself, dispositive of the veil-piercing inquiry. *See Dadourian Grp. Int'l Inc. v. Simms*, [2006] EWHC 2973(Ch.) (*"Dadourian"*) [¶ 683] ("It is not permissible to lift the veil simply because a company has been involved in wrong-doing, in particular simply because it is in breach of contract."), *aff'd*, [2009] EWCA Civ 169 (C.A.).[32] Instead, "the court is entitled to 'pierce the corporate veil' … [and hold liable] the individual(s) in control of it [only] if the company was used as a device or façade to conceal the true facts thereby avoiding or concealing any liability of those individual(s)." *Trustor*, [2001] 1 W.L.R. at 1185 [¶ 23]. *Trustor* has subsequently been interpreted to mean that "[t]he impropriety must be linked to the use of the company structure to avoid or conceal liability." *Hashem*, [2008] EWHC 2380 [¶ 162]. "[I]t follows from all this that if the court is to pierce the veil it is necessary to show *both* control of the company by the wrongdoer(s) *and* impropriety, that is, (mis)use of the company by them as a device or façade to conceal their wrongdoing." *Id.* [¶ 163].[33] Moreover, the court may pierce the veil "only so far as is necessary to provide a remedy for the particular wrong which those controlling the company have done." *Id.* [¶ 164]; *see also Dadourian*, [2006] EWHC 2973 [¶ 682] ("[T]he veil, if it is to be lifted at all, is to be lifted for the purposes of the relevant transaction.").

---

**32.** Likewise, in *Trustor*, the Vice–Chancellor observed that "[c]ompanies are often involved in improprieties" and that "it would make undue inroads into the principle of *Salomon's* case if an impropriety not linked to the use of the company structure to avoid or conceal liability for that impropriety was enough." *Trustor*, [2001] 1 W.L.R. at 1185 [¶ 22].

**33.** Note that the veil-piercing inquiry does not turn on the purpose for which the corporate structure was originally formed. "[A] company can be a façade even though it was not

originally incorporated with any deceptive intent." *Hashem*, [2008] EWHC 2380 [¶ 164]; *see also* Payne at 290. For example, in *Trustor*, the fact that Introcom was a genuine company with a separate trading existence did not prevent its corporate veil from being pierced. *Trustor*, [2001] 1 W.L.R. at 1185 [¶ 16]. "The question is whether [the company] is being used as a façade at the time of the relevant transaction(s)." *Hashem*, [2008] EWHC 2380 [¶ 164].

Third, where a corporate structure is interposed for the purpose of shielding a defendant from liability to the plaintiff or other third parties, the plaintiff's ability to recover from the defendant on a veil-piercing theory turns on whether the defendant had already incurred some liability to the plaintiff at the time he interposed the corporate structure. In *Adams,* a corporate structure that was "clearly a façade in the relevant sense" was nevertheless not able to be pierced because "there was nothing illegal as such in [the parent corporation] arranging its affairs" to avail itself of the *Salomon* principle in order to shield itself from contingent future liabilities. *Adams,* 1990 Ch. at 543–44. *Adams* thus drew a clear distinction between a defendant using a corporate structure to "evade ... such rights of relief against him as third parties already possess"—conduct for which veil-piercing may apply—and a defendant using a corporate structure to evade "such rights of relief as third parties may in the future acquire"—conduct which, good or bad, was thought "inherent in our corporate law." *Adams,* [1990] Ch. at 544. Indeed, the court in *Hashem* observed:

> The common theme running through all the cases in which the court has been willing to pierce the veil is that the company was being used by its controller in an attempt to immunize himself from liability for some wrongdoing which existed entirely *dehors* [i.e., outside or irrespective of] the company. It is therefore necessary to identify the relevant wrongdoing—in *Gilford* and *Jones v. Lipman* it was a breach of contract which, itself, had nothing to do with the company, in *Gencor [ACP Ltd. v. Dalby,* [2000] 2 B.C.L.C. 734(Ch.)] and *Trustor* it was a misappropriation of

someone else's money which again, in itself, had nothing to do with the company—before proceeding to demonstrate the wrongful misuse or involvement of the corporate structure.

*Hashem,* [2008] EWHC 2380 [¶ 199]; *see also Lindsay v. O'Loughnane,* [2010] EWHC 529 (Q.B.D.) [¶¶ 132–40] (quoting and relying upon *Hashem's* analysis); *Law Soc'y of Eng. & Wales v. Habitable Concepts Ltd.,* [2010] EWHC 1449(Ch.) ("*Law Society*") [¶ 20] (same).

Other recent veil-piercing cases have reached the same conclusion as *Hashem* in this respect. In *Kensington,* the High Court stated that "[t]he corporate structure could legitimately be used" to limit "the legal liability (if any) in respect of particular *future* activities," while "transactions or structures, which have no legal substance, and which are set up with a view to defeating *existing* claims of creditors ... can, if they are purely a sham and a façade, be treated by the court as lacking validity." *Id.* [¶¶ 185, 187] (emphasis added). Indeed, the *Kensington* court's decision to pierce the veil expressly depended on a finding that "[u]nlike *Adams,* the liabilities of the [defendant] are not future potential liabilities but existing liabilities under extant judgments." *Id.* [¶ 190]. Moreover, in *Kuwait Oil Tanker Co. SAK v. Al Bader,* Justice Teare permitted post-judgment veil-piercing to treat a company's assets as those of the judgment debtor, but only because the court was "satisfied that [the company] was acquired by Mr. Al Bader ... for the purpose of ensuring that his assets would not be available to meet his *then existing (though not yet established)* liability to the Claimants for fraud." [2008] EWHC 2432 (Q.B.D.) [¶ 35] (emphasis added).[34] Commentators also

---

34. Note, however, that *Creasey* also lifted the corporate veil where the defendants had used

the corporate form to defeat "existing (though not yet established) liability" to the plaintiff,

regard the distinction between existing legal duty and potential future liability as fundamental to understanding English veil-piercing law.[35]

Fourth, where the plaintiff may recover in fraud or "deceit" against a defendant directly, that path is preferable to indirect liability via veil-piercing. This principle was made plain by the High Court in *Dadourian*, where the plaintiffs' claims against the defendants included fraudulent misrepresentation, civil conspiracy, and breach of contract on a veil-piercing theory. *Dadourian*, [2006] EWHC 2973 [¶¶ 15–16]. In a preceding arbitration, the defendants had been found liable for fraudulent misrepresentation. *Id.* [¶ 2]. The High Court observed that "whilst a person committing the tort of deceit should be liable for all the loss which flows from his misrepresentation, it would be unprincipled to impose a liability on him for the loss of bargain [i.e., contract damages] suffered by a misrepresentee in respect of a contract with a third party with whom he had been induced to con-

tract by the misrepresentation." *Id.* [¶ 684]. The court reasoned:

[I]t may well be that where A contracts with B as a result of B's fraudulent misrepresentation and the contract has been completed ... A is able to claim (a) damages for loss of bargain as a result of B's breach of contract and (b) reliance loss, although he could not obtain double recovery. It does not follow that B should be liable for contractual damages to A where the contract which he procured was one between A and C, even where C is the creature of B. To put the point another way, where in that example the principle of corporate separation exemplified in [*Salomon*] would apply absent a misrepresentation by the person controlling the company, there is no need, and it would be inappropriate, to lift the veil in order to provide A with a contractual remedy against B; A recovers all his loss arising as a result of the misrepresentation by his tortious claim in deceit.

*Id.* [¶ 685] (Warren, J.).[36] Applying this reasoning, where an individual ("B") has,

who sued after they had caused him to be unlawfully discharged from employment. *Creasey* was explicitly disapproved by the Court of Appeal in *Ord*.

**35.** *See, e.g.,* Andrews at 7 ("[S]heltering behind the fictional veil of incorporation to limit personal liability for future business activities in the absence of any specific planned impropriety linked to the company structure, is simply legitimate reliance on the principle articulated in [*Salomon*]."); Goulding at 72 ("[*Ord's*] rejection of *Creasey* makes it unlikely that the courts will ever be willing to lift the veil unless there is clear evidence of a transfer designed to avoid an *existing* contractual or other liability." (emphasis added)); Payne at 290 ("In order for the fraud exception to the *Salomon* principle ... to be successfully invoked, the defendant must have the intention to use the corporate structure in such a way as to deny the plaintiff some pre-existing legal right."); Sealy & Worthington at 63 ("In both [*Gilford*] and [*Jones*], the

company whose separate existence was disregarded had been set up deliberately in an attempt to evade an *existing* obligation," while in *Adams*, it "was made clear that the law does not look with similar disfavour on the formation of a limited liability company in order to confine the *future* or *contingent* liabilities of an enterprise within specific limits.").

**36.** To the extent this reasoning reflects the common law preference for legal remedies over equitable ones, a similar principle applies under U.S. law. "It is well-established under New York law that equity will not entertain jurisdiction where there is an adequate remedy at law." *Superint't of Ins. v. Ochs (In re First Cent. Fin. Corp.),* 377 F.3d 209, 215 (2d Cir.2004) (citation omitted); *see also Reg'l Airport Auth. of Louisville v. LFG, LLC,* 460 F.3d 697, 711 (6th Cir.2006) ("Kentucky follows the traditional rule that equitable relief is not available where there exists an adequate remedy at law.").

by making fraudulent misrepresentations, procured a contract between the plaintiff ("A") and a third party ("C"), and C subsequently breaches that contract, any claim that A possesses against B sounds in tort rather than in contract, "even where C is the creature of B." Thus, where "[t]he Claimants have their remedy ... in the form of an action for fraudulent misrepresentation," "[t]here is simply no need ... to lift the veil at all." *Id.* [¶ 686].[37]

Although *Dadourian* was the first case to articulate this fourth principle clearly, it was not the first to suggest its existence. For example, in 2002, Lord Hoffmann observed in *dicta* that, if an individual defendant makes a fraudulent misrepresentation on behalf of a company, that individual defendant need not be held liable through a circuitous veil-piercing theory but rather, may be made to answer for his own tort. *Std. Chartered Bank v. Pak. Nat'l Shipping Corp.*, [2002] UKHL 43 [¶¶ 20–22], [2003] 1 A.C. 959, 968–69 (H.L.) ("*SCB*"); *see also* Lowry & Dignam at 47 (citing *SCB* and observing that "if the tort is deceit rather than negligence the courts will allow personal liability to flow to a director or employee"). The seeds of *Dadourian's* reasoning were, in fact, sown as early as *Salomon*, wherein Lord Davey observed that ("[i]f [Salomon] has committed a fraud or misdemeanour ... he may be proceeded against civilly" by the plaintiff). *Salomon*, [1897] A.C. at 57.

Finally, although not a veil-piercing principle *per se*, English courts have observed that parties may avoid the harsh effects of the *Salomon* principle by the exercise of due diligence, for instance, by contracting around a potential problem. As Lord Herschell observed in *Salomon* itself: "[I]t must be remembered that no one need trust a limited liability company unless he so please, and that before he does so he can ascertain, if he so please, what is the capital of the company and how it is held." *Salomon*, [1897] A.C. at 46 (Lord Herschell). More recently, in *Yukong*, the High Court stated that "[i]t has long been recognised that the *Salomon* principle can cause hardship, although those dealing with one-man companies may, and commonly do, seek to protect themselves by requiring a personal guarantee." *Yukong*, [1998] 1 W.L.R. at 305 (citation omitted). As such, assuming a plaintiff has acted prudently to protect itself, veil-piercing is unnecessary because the plaintiff may recover directly on a breach of guarantee against the defendant.

## C. Factual Findings on Veil–Piercing Claim

Before applying this determination of English law to the question of whether Brearly's corporate veil may be lifted to impose liability on the UK Defendants, it is helpful to describe the Bankruptcy Court's decision. The court held, following trial, that Brearly's liability for breach of contract should be imposed on the four UK Defendants as a matter of English law. In ascertaining the content of English law, the Bankruptcy Court relied upon the UK

---

**37.** Although Justice Warren proceeded to articulate alternative grounds for his decision "in case [he was] wrong in that approach," *id.* [¶ 688], his judgment was affirmed, *see Dadourian*, [2009] EWCA Civ 169, and subsequent justices of the High Court have relied on *Dadourian's* reasoning. *See, e.g., Lindsay v. O'Loughnane*, [2010] EWHC 529 (Q.B.D.) [¶ 130] (Flaux, J.) (applying *Dadourian* for the principle that "where a claim in deceit succeed[s] against the person controlling the company, it would be inappropriate to permit the veil to be lifted to enable the claimant to pursue a contractual claim against that person"); *Law Society*, [2010] EWHC 1449 [¶ 22] (Norris, J.) (refusing to "press the principle of piercing the corporate veil beyond its proper bounds[;] particularly when there is an alternative" in tort); *Hashem*, [2008] EWHC 2380 [¶¶ 158–59, 165].

Defendants' post-trial memorandum of law; various English cases (including *Gilford, Trustor, Kensington,* and *Ord* ); and a number of New York and Kentucky cases, whose reasoning the court relied upon by analogy.

The Bankruptcy Court's factual findings, construed in the light most favorable to the Plaintiff, are as follows. Brearly was a "shell corporation" formed under Gibraltar law by Abbey, an English investor "who was a friend and business acquaintance of Simons." *In re Tyson,* 412 B.R. at 628. Abbey permitted Simons to use Brearly "as the vehicle to carry out the transactions relating to the international rights to the Fight" on the sole condition that "Simons perform all the work." *Id.* at 631. Abbey was Brearly's sole shareholder,[38] and "[a]t the time of the Fight, Brearly had minimal capitalization (if any), no assets, no offices and no employees, and it had never engaged in any business." *Id.* at 628; *see also id.* at 640–41. Further, although some of the contracts entered into by Brearly required Fight proceeds to be deposited into a "Brearly" bank account, there was no evidence that Brearly had its own bank account. *Id.* at 640–41. The Bankruptcy Court thus concluded that "Brearly was not what the UK Defendants said it was"—"an offshore subsidiary or affiliate of Sports Network used for the purpose of saving taxes"—but rather, "someone else's shelf entity, a corporate shell, with no employees, capital or business, used as a 'facade concealing true facts.'" *Id.* at 640.

It was undisputed at trial that none of the UK Defendants were incorporators, owners, directors, shareholders, or employees of Brearly, or otherwise legally related to that entity. Nonetheless, the Bankruptcy Court made ample findings concerning activities undertaken by the UK Defendants—and, in particular, by Simons—on Brearly's behalf. Simons and Heath "were the only parties who negotiated with Straight Out in connection with the acquisition of the international rights to the Fight." *Id.* In representing Brearly, Simons and Heath "used Sports Network's stationery and business facilities in England to carry on all [of Brearly's] business." [39] *Id.* at 641. The actual sales of the International Rights were conducted on Brearly's behalf by Simons, among others.[40] *Id.* at 632. Simons took responsibility for approving all of Brearly's licensing deals, collecting revenues, paying out expenses, keeping all accounting records, and overseeing administrative tasks performed by others.[41] *Id.* at 631. The post-Fight income statement summarizing the International Proceeds was prepared on Brearly's behalf by a Sports Network accountant. *Id.* at 635 & n. 13. Indeed, aside from Abbey's initial consent to allow Brearly to be used, and aside from Marrache's apparent role in approving (and later repudiating) the July 26 Assignment, every person who acted on Brearly's be-

---

38. According to the parties' submissions on appeal, Abbey was one of two corporate officers of Brearly. The other officer was an unidentified individual at Marrache, Brearly's counsel in Gibraltar.

39. On appeal, the Plaintiffs also rely on evidence that all communications sent by Heath were from Sports Network or Warren-affiliated email addresses.

40. Simons also involved David McConachie ("McConachie") and Chester English in sell-

ing the International Rights on Brearly's behalf. In addition to working for Sports Network, McConachie had his own business, and the parties disagree on appeal regarding the capacity in which McConachie was asked to work for Brearly.

41. The Plaintiff contends on appeal, for example, that McConachie prepared Brearly's invoices at Simons' instruction.

half in connection with the Fight was someone who was also affiliated with, or employed by, Sports Network or Sports & Leisure.

Based on this and other evidence, the Bankruptcy Court concluded that "Brearly never had a real interest in the transaction or a true economic stake, and the UK Defendants ignored its position when it suited their interests." *Id.* at 641. For instance, the UK Defendants caused Brearly to assign to Sports Network its right to sell the Fight in the United Kingdom, apparently because Sports Network had an exclusive contractual relationship with the only broadcaster capable of televising the Fight there. *Id.* at 632, 641. The UK Defendants also paid Showtime its $1.3 million out of Sports Network's revenues from the UK sales, thus satisfying Warren's personal guarantee to Showtime (as well as Brearly's obligation to Showtime under the July 26 Assignment). *Id.* at 641. Likewise, the UK Defendants caused Brearly to appear and then default in certain post-Fight litigation in Kentucky[42]—conduct which the Bankruptcy Court regarded as an "abuse of the process of two courts . . . [that] constitutes a further misuse of the corporate form that supports veil piercing." *Id.*

The Bankruptcy Court further found that the UK Defendants introduced Brearly to the transaction with improper motives. Namely, the court found that the UK Defendants used Brearly with the intent to "injure and defraud" Tyson and the Kentucky Defendants by causing Brearly to agree to the Distribution Agreement and the July 26 Assignment "without any intention of honoring them." *Id.* at 642. In reaching this conclusion, the Bankruptcy Court relied on the trial testimony of Espinoza and Webb and the deposition testimony of Abbey. Espinoza, Tyson's

attorney, "testified credibly that Heath had told him, in several conversations in the days leading up to the Assignment Agreement, that Brearly was a Sports Network company being used for tax purposes and that it had been used in this manner previously." *Id.* at 633–34. The court explained that Espinoza "believed Heath because this use of an offshore company was credible and, '[e]ssentially, everything that [Espinoza] saw in connection with Brearly came from Sports Network.'" *Id.* at 634. Likewise, the Bankruptcy Court found that Webb had been "told by Simons that Brearly was an offshore Sports Network entity being used to distribute the Fight." *Id.* at 632. Finally, the Bankruptcy Court credited testimony by Abbey in which he speculated that the reason why Simons had asked him to use Brearly was " 'because it helped [the] deal with Frank Warren and Sports Network.'" *Id.* at 642.

Finally, the Bankruptcy Court found further evidence of bad faith in the circumstances surrounding Brearly's breach of the July 26 Assignment. The court found that Marrache repudiated the July 26 Assignment on the basis that " 'Brearly ha[d] neither been consulted nor been made a party to any . . . agreement.'" *Id.* at 634. The court also found, however, that "[t]he signed version of the [July 26] Assignment Agreement bears a fax transmittal line showing a fax transmission from Marrache & Co., Brearly's law firm in Gibraltar, to Sports Network, and a further fax from Sports Network to Louisville, all on the day of the Fight." *Id.* As a result, the Bankruptcy Court concluded that the UK Defendants had caused Brearly to disavow the July 26 Assignment for "wholly spurious reasons." *Id.* at 642.

---

42. This litigation is described in Section III.A below.

Tying together its findings, the Bankruptcy Court concluded that "the UK Defendants used Brearly as part of a scheme or ruse to accomplish Warren's goals: have Williams fight Tyson and possibly go on to secure a championship fight for Sports Network, while avoiding any liability to Tyson and Straight Out." *Id.* at 644. The Bankruptcy Court concluded that "there could be no more apt description of the actions of the UK Defendants than that they devised 'the corporate structure . . . as a mere facade concealing true facts.'" *Id.* at 640 (quoting UK Defendants' Post–Trial Memorandum of Law). As such, the Bankruptcy Court decided to lift Brearly's corporate veil and hold the UK Defendants personally liable.

D. Application of English Law

Notwithstanding all of the foregoing evidence, and the deference owed on appeal to the Bankruptcy Court's fact-finding, English law does not permit Brearly's corporate form to be disregarded to hold the UK Defendants liable for Brearly's debts. At least two considerations compel this conclusion.

■ First, the Court has located no support in English law for the proposition that parties who are legally unrelated to a corporate entity may be held responsible for that entity's liabilities, at least in the absence of specific statutory authority.[43] The Plaintiff has also not directed the Court to any legal authority that would refute the arguments made by Warren and Simons on appeal that strangers to a corporate entity may not be held liable through judicial veil-piercing for that entity's obligations. Nor does the Plaintiff contest the fact that Brearly was incorporated, owned, and controlled (aside from the transaction in question) by one man, Peter Abbey, against whom neither the Plaintiff nor the Kentucky Defendants have brought any claims.

This legal question was insufficiently addressed by the parties during the Adversary Proceeding. The Bankruptcy Court observed that "[n]o case has been cited where someone else's corporate shell was used in a scheme like the one at bar." *Id.* at 643. In the absence of legal guidance from the parties regarding how English law would address this question, the Bankruptcy Court concluded that "the use of an unrelated shell corporation appears more abusive than the use of an entity that is owned by those in control." *Id.* The court reasoned that "[u]se of someone else's shell entity would appear to permit those in control to disclaim responsibility and repudiate agreements more easily" than could a parent corporation with respect to its subsidiary or affiliate. *Id.* This appeal to equity, however, runs counter to the principles of English law described above that prohibit piercing the corporate veil on the basis of equity alone.

■ A comparison to veil-piercing in the United States may be instructive.[44]

---

43. Where a statute so authorizes, however, a non-director may be treated as akin to a director. *See Customs & Excise Comm'rs v. Holland (In re Paycheck Servs., 3 Ltd.),* [2009] EWCA Civ 625 (C.A.) [¶¶ 45–47] (describing the liability of a "de facto" director under the Insolvency Act 1986 §§ 212, 251); *see also R. v. K,* [2005] EWCA Crim 619 (C.A.) [¶¶ 16–26] (concluding that the legal ownership or control of a corporation may be disregarded for purposes of applying the Proceeds of Crime Act 2002 § 80(3)).

44. As the description of English law on veil-piercing demonstrates, however, American and English law have diverged in their treatment of this doctrine. Thus, there can be limited reliance on analogous American law principles in the absence of a careful examination of the extent to which they may be inconsistent with English law.

U.S. courts proceed from the assumption that, when the corporate veil is pierced, it is done in order to hold liable someone with a legal interest in the corporate entity. Nonetheless, many U.S. jurisdictions, including New York, have recognized a doctrine of "equitable ownership" whereby persons who are not formally affiliated with a corporation by law may nevertheless be held liable on a veil-piercing theory. "New York courts have recognized for veil-piercing purposes the doctrine of equitable ownership, under which an individual who exercises sufficient control over the corporation may be deemed an 'equitable owner,' notwithstanding the fact that the individual is not a shareholder of the corporation." *Freeman v. Complex Computing Co., Inc.*, 119 F.3d 1044, 1051 (2d Cir.1997) (citing *Guilder v. Corinth Constr. Corp.*, 235 A.D.2d 619, 651 N.Y.S.2d 706, 707 (App. Div.3d Dep't 1997)); *see also Lally v. Catskill Airways, Inc.*, 198 A.D.2d 643, 603 N.Y.S.2d 619, 621 (App. Div.3d Dep't 1993). Under New York's "equitable ownership" test, however, it must be shown that the defendant "exercised considerable authority over the corporation to the point of completely disregarding the corporate form and acting as though its assets were his alone to manage and distribute." *Freeman*, 119 F.3d at 1051 (quoting *Lally*, 603 N.Y.S.2d at 621); *see also Guilder*, 651 N.Y.S.2d at 707. But, even if UK law recognized an "equitable ownership" theory of liability similar to that recognized in many American jurisdictions, the factual findings of the Bankruptcy Court do not support a finding that the UK Defendants—to the exclusion of Abbey, Marrache, and all others—"exercised [such] considerable authority over [Brearly] to the point of completely disregarding the corporate form and acting as though

its assets were [theirs] alone to manage and distribute." *Freeman*, 119 F.3d at 1051 (citation omitted).

■ For a second and entirely separate reason, the record in this case does not permit the piercing of Brearly's corporate veil. The factual findings cannot support veil-piercing because of the key distinction in English law between using the corporate form to evade or conceal existing legal obligations or wrongs on the one hand, and using it to insulate oneself from future or contingent liabilities on the other. The evidence, even when construed in the light most favorable to the Plaintiff, reveals that, at the time Brearly was introduced into the transaction, the UK Defendants had not yet incurred any legal obligations to Tyson or the Kentucky Defendants with respect to sale of the International Rights. *See In re Tyson*, 412 B.R. at 630–32. Nor was Brearly's existence concealed from the parties; although the Bankruptcy Court did appear to conclude that Brearly was introduced into the transaction in bad faith, *id.* at 642, there is no evidence in the record to suggest that either Tyson or the Kentucky Defendants were unaware that Brearly was their contractual counterparty under the July 26 Assignment and Distribution Agreement, respectively. As such, if they had doubts about the UK Defendants' good faith, Tyson and the Kentucky Defendants could have refused to deal with Brearly and/or the UK Defendants.[45] Even if Brearly was a "perfect set-up" and "came in handy" for the UK Defendants, *id.*, English law provides that a party is entitled to take advantage of the *Salomon* principle in order to limit its future liabilities, even where the corporate entity to be interposed is nothing more than a mere

---

45. The Court makes no finding in this Opinion, however, concerning the reasonableness of Tyson's or the Kentucky Defendants' reliance for the purposes of analyzing the Plaintiff's tort claims.

shell or fiction. To paraphrase *Adams:* "[w]hether or not [the UK Defendants' use of Brearly was] desirable" as a matter of public policy, "the right to use a corporate structure in this manner is inherent in [English] corporate law." *Adams*, [1990] Ch. at 544.

### E. Plaintiff's Fraud and Unjust Enrichment Claims

In the Adversary Proceeding, the Plaintiff also asserted a fraud claim against Warren and Simons and an unjust enrichment claim against the four UK Defendants. The Bankruptcy Court determined, applying New York choice-of-law principles, that Kentucky law governed these claims.[46] The Bankruptcy Court concluded, however, that "the only damages that Plaintiff could assert from [his] fraud claim are the same contract damages that are being imposed on the UK Defendants by virtue of the piercing of Brearly's corporate veil." *In re Tyson*, 412 B.R. at 645.[47] Likewise, because relief on the veil-piercing claims was granted, the Bankruptcy Court concluded that "there is no

cause to resort to the equitable doctrine of unjust enrichment to fashion a remedy in this case against Sports Network." [48] *Id.* at 640. The Bankruptcy Court thus declined to rule in the alternative regarding whether the Plaintiff would recover for fraud or unjust enrichment if veil-piercing had not been available.

■ Because the Bankruptcy Court erred in piercing Brearly's corporate veil, a question emerges whether the Plaintiff could recover the same money judgment, in full or in part, on his claims of fraud or unjust enrichment. As this Court sits in an appellate capacity pursuant to 28 U.S.C. § 158(a)(1), it declines to make the first determination as to this question. Thus, without expressing any opinion as to the proper outcome, the Court remands this case to the Bankruptcy Court so that it may consider, in the first instance, whether the Plaintiff may recover on his fraud and unjust enrichment claims.[49]

### F. Warren's Claim for Attorney's Fees

Finally, Warren asserts that, in the event that he prevails on appeal, he is

---

**46.** This finding was proper and has not been challenged on appeal. *See Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 397 n. 1 (2d Cir.2001) (observing that New York conflict-of-law principles recognize "depecage," or the application of different jurisdictions' laws to different claims for relief).

**47.** The Bankruptcy Court revisited the question of a fraud recovery during post-trial motion practice. Ruling from the bench, the court held that "[b]oth plaintiff and cross claimants have failed to establish each of the six issues that must be proved in order to sustain a fraud complaint under Kentucky law." The court further concluded that "[t]his failure of proof is not cured by the Court's finding, which it reiterates, that the U.K. defendants used Brearly for improper and indeed fraudulent purposes. That finding, however, does not entitle any plaintiff to a recovery sounding in common-law fraud." Read in context, however, this ruling may have merely reflected the court's judgment

that the Plaintiff and Kentucky Defendants could not prove *additional* damages beyond that permitted on a contractual recovery.

**48.** In the *August 2009 Opinion*, the Bankruptcy Court implies that the Plaintiff's fraud claim was asserted against all four UK Defendants and that the unjust enrichment claim was brought against Sports Network alone. The Plaintiff's operative complaint, however, asserts a fraud claim against Warren and Simons and an unjust enrichment claim against all four UK Defendants.

**49.** Certain other arguments made by Warren on appeal, including that the Bankruptcy Court erred by failing to apply the Statute of Frauds and that the Bankruptcy Court incorrectly interpreted the July 26 Assignment, need not be addressed in light of this Opinion's disposition of the veil-piercing claim and its remand to the Bankruptcy Court for further proceedings.

entitled to his attorney's fees under English law. Under English practice, a prevailing party is ordinarily awarded its "costs," including attorney's fees. *See, e.g., APL Co. Pte. Ltd. v. UK Aerosols Ltd.*, 582 F.3d 947, 957 (9th Cir.2009) ("Under the English rule, attorneys' fees are generally awarded to the prevailing party."); *RLS Assocs., LLC v. United Bank of Kuwait PLC*, 464 F.Supp.2d 206, 210 (S.D.N.Y.2006) ("*RLS*") ("Under the English rule, the prevailing party can generally recover its attorneys' fees from the losing party."). In commercial litigation, an award of costs is normally entered against the party who is held indebted to the other. *See A.L. Barnes Ltd. v. Time Talk (UK) Ltd.*, [2003] EWCA Civ 402 (C.A.) ("*Time Talk*") [¶ 28] ("In what may generally be called commercial litigation . . . the disputes are ultimately about money. In deciding who is the successful party the most important thing is to identify the party who is to pay money to the other. That is the surest indication of success and failure."). The determination of such an award, however, rests within the discretion of the court.[50]

The Bankruptcy Court addressed this same question from the opposite perspective during post-trial motion practice, when the Kentucky Defendants sought an award of their attorney's fees under English law. The Bankruptcy Court declined to award them attorney's fees on two separate grounds. First, the Bankruptcy

Court determined, citing *Time Talk* and *Multiplex*, that "English law places great emphasis on the monetary recovery obtained by a party in determining whether such party is a prevailing party entitled to attorneys' fees as part of costs under English law." Because the Kentucky Defendants did not obtain any net monetary recovery under the Judgment, the Bankruptcy Court concluded that they were not entitled to costs under English law.

Second, the Bankruptcy Court observed that "there is no authority applying the English law on shifting attorneys' fees" in U.S. court proceedings absent a clear contractual agreement by the parties. In so concluding, the Bankruptcy Court implicitly applied the "American Rule" that each litigant is to bear his or her own costs of litigation, including attorney's fees. *See, e.g., Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 199 (2d Cir.2003) (New York law) (noting that "attorneys' fees are the ordinary incidents of litigation and may not be awarded to the prevailing party," and that any contrary intent by the parties should be made "unmistakably clear [in] the language of the contract" (citation omitted)); *AIK Selective Self–Ins. Fund v. Minton*, 192 S.W.3d 415, 420 (Ky.2006) (Kentucky law) ("[W]ith the exception of a specific contractual provision allowing for recovery of attorneys' fees . . . each party assumes responsibility for his or her own attorneys' fees." (citation omitted)).

---

**50.** *See* Civil Procedure Rules 1998, R. 44.3(1) ("The court has discretion as to—(a) whether costs are payable by one party to another; (b) the amount of those costs; and (c) when they are to be paid"); *id.* R. 44.3(2) ("If the court decides to make an order about costs—(a) the general rule is that the unsuccessful party will be ordered to pay the costs of the successful party; but (b) the court may make a different order."); *see also Hullock v. E. Riding of Yorkshire County Council*, [2009] EWCA Civ 1039 [¶ 19] (C.A.) ("Costs are in the discretion of the trial judge."); *Lamont v. Burton*, [2007] EWCA Civ 429 [¶ 20] (C.A.) ("The court has a wide discretion under rule 44.3 to make whatever costs order it considers appropriate in the particular circumstances of the case, taking account of the various factors specified in the rule."); *Multiplex Constrs. (UK) Ltd. v. Cleveland Bridge UK Ltd.*, [2008] EWHC 2280 (Q.B.D.) (Jackson, J.) ("*Multiplex*") [¶ 72] (summarizing principles for guiding a court's discretion in awarding attorney's fees).

In the absence of any significant federal bankruptcy policy, a bankruptcy court applies the choice-of-law rules of the forum state. *Bianco v. Erkins (In re Gaston & Snow)*, 243 F.3d 599, 607 (2d Cir.2001). New York's choice-of-law principles would treat the English rule regarding attorney's fees as "substantive," not procedural, and thus where English law governs a given cause of action, so too should the English rule regarding attorney's fees. *RLS*, 464 F.Supp.2d at 218 ("[T]he English rule creates a quasi-right of action for 'wrongful' legal costs.... These quasi-rights of action, which are created by the English rule for attorneys' fees, accompany every cause of action under English law.")

Given that any award of attorney's fees under English law rests in the court's discretion, and given that the Plaintiff or Kentucky Defendants may ultimately prevail in this litigation on other grounds, it is premature to determine whether, and if so to what extent, Warren should recover any award of attorney's fees for his victory on the veil-piercing claim. The Court therefore declines to reach this ground of Warren's appeal, leaving it to the Bankruptcy Court to address this question in the first instance.

## III. Kentucky Defendants' Appeal

The Kentucky Defendants appeal the Bankruptcy Court's "refusal to provide them monetary relief." They assert three points of error, each in the alternative. First, the Kentucky Defendants challenge the Bankruptcy Court's refusal to recognize a default judgment obtained by Straight–Out against *Brearly* in Kentucky federal court on December 16, 2008 (the "Kentucky Default Judgment") as binding against the *UK Defendants*. Second, the Kentucky Defendants challenge the Bankruptcy Court's refusal to grant their post-trial motion for leave to amend their pleadings to assert a fraud cross-claim against the UK Defendants and/or to conform their pleadings to match the evidence at trial. Third, the Kentucky Defendants assert that the Bankruptcy Court erred in refusing to award them attorney's fees under English law. Each argument is addressed in turn below.

### A. Kentucky Default Judgment

The Kentucky Defendants' first argument on appeal is that the Bankruptcy Court erred by failing to recognize and enforce the Kentucky Default Judgment. For the following reasons, the Bankruptcy Court's Judgment is vacated insofar as it denies the Kentucky Defendants a monetary recovery, and the case is remanded for further proceedings.

### 1. Facts and Procedural History

On August 13, 2004, shortly after the Fight, Straight–Out filed two lawsuits in the United States District Court for the Western District of Kentucky (the "Kentucky Court"). One lawsuit was filed against Brearly (the "Kentucky Litigation") alleging breach of contract and unjust enrichment for failure to pay Straight–Out its $2.7 million minimum guarantee under the Distribution Agreement. The other lawsuit was filed against Warren, Sports & Leisure, and Sports Network for breach of several other contracts that are not at issue in this litigation.[51] The same attorney appeared to represent all defendants in both actions, and the attorney successfully obtained dismissal on *forum non conveniens* grounds

---

**51.** These contracts included, *inter alia*, a co-promotional rights agreement and a provision-of-services agreement to compensate Ty-son's opponent, Williams, for his participation in the Fight.

of the non-Brearly action. After the Kentucky Court denied Brearly's motion to dismiss in the Kentucky Litigation and granted Brearly several extensions of time to answer, the Kentucky Court subsequently permitted Brearly's attorney to withdraw, and Brearly thereafter defaulted. After Straight–Out moved for a default judgment, the Kentucky Court granted that motion on or about March 1, 2006 in what it termed its "Default Judgment Order," subject to the court's retention of jurisdiction over post-judgment discovery.

After no further damages were proved, final judgment was entered on December 16, 2008. The Kentucky Default Judgment entered against Brearly totaled $4,554,191, including: (1) a principal sum of $2.7 million, which was the amount of Straight–Out's minimum guarantee under the Distribution Agreement; (2) pre-judgment interest at 8% per annum (totaling $356,580); (3) attorney's fees for prosecuting the Kentucky Litigation and obtaining the default judgment (totaling $71,875); (4) a 30% contingent attorney's fee ($938,537); (5) anticipated costs and expenses to be incurred in attempting to collect on the judgment ($87,500); and (6) post-judgment interest accruing from March 1, 2006 at the rate of 4.70% per annum, compounded annually.

Meanwhile, on August 17, 2007, the Bankruptcy Court in New York granted the Kentucky Defendants' motion to vacate the default judgment entered against them in the Adversary Proceeding. *See August 2007 Opinion*, 2007 WL 2379624. On September 10, 2007, the Kentucky Defendants asserted a cross-claim against the UK Defendants alleging, in pertinent part, that "[a]s the alter ego of Brearly, the [UK Defendants] are liable to Straight–Out for the liabilities of Brearly, including the amounts due under the Kentucky [Default] Judgment." Trial was held on the Kentucky Defendants' veil-piercing cross-claim concurrently with the Plaintiff's claims in March 2009.

In the *August 2009 Opinion*, the Bankruptcy Court declined to recognize the Kentucky Default Judgment as binding against Brearly or the UK Defendants, finding that "[t]he Kentucky Defendants overreach when they argue that the default judgment entered in the Kentucky litigation regarding Straight Out's breach of contract claim against Brearly should be determinative and conclusive on the amount of damages." *In re Tyson*, 412 B.R. at 639. In particular, the Bankruptcy Court suggested that the Kentucky Default Judgment was premised on an erroneous calculation of damages, given the evidence at trial that Straight–Out had assigned away "the entire amount of its $2.7 million guaranteed recovery" from Brearly through the July 26 Assignment. *Id.* The Bankruptcy Court concluded that "[s]ince the proceeds from the international sales of the Fight did not exceed $2.7 million, Straight Out did not establish that it has a right to a net contractual recovery based on the record in this case." *Id.*

After the *August 2009 Opinion* was issued, the Kentucky Defendants registered the Kentucky Default Judgment in the Southern District of New York pursuant to 28 U.S.C. § 1963 on August 26, 2009. Thereafter, the Kentucky Defendants again sought recognition of the Kentucky Default Judgment by the Bankruptcy Court, and in particular, sought to transform the attorney's fee component of the Kentucky Default Judgment into a monetary recovery against the UK Defendants to be included in the Bankruptcy Court's Judgment. In proceedings held on the record before the Bankruptcy Court on October 22, 2009, the Bankruptcy Court declined to subsume any part of the Kentucky Default Judgment into the Bank-

ruptcy Court's Judgment. The Bankruptcy Court observed, *inter alia*, that there appeared to be no basis under Kentucky law for the Kentucky Court's decision to award attorney's fees to Straight–Out.

2. Analysis

The Kentucky Defendants argue that the Bankruptcy Court "erred by failing to give Full Faith and Credit" to the Kentucky Default Judgment.[52] The Kentucky Defendants argue that the Bankruptcy Court should have applied the Kentucky Default Judgment against the UK Defendants by using *res judicata* to bar the UK Defendants from contesting the amount of damages on the Kentucky Defendants' veil-piercing claims. While recognizing that the UK Defendants were not actually parties to the supposedly preclusive Kentucky Litigation, the Kentucky Defendants assert that the UK Defendants "completely controlled the legal defense of Brearly before the Kentucky federal district court," and therefore that the UK Defendants are now bound by the Kentucky Default Judgment pursuant to *Taylor v. Sturgell*, 553 U.S. 880, 128 S.Ct. 2161, 171 L.Ed.2d 155 (2008).[53]

▆▆▆ "The preclusive effect of a federal-court judgment is determined by federal common law." *Taylor*, 553 U.S. at 891, 128 S.Ct. at 2171. "The preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as 'res judicata.'" *Id.* "Under the doctrine of claim preclusion, a final judgment forecloses 'successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit.'" *Id.* (citation omitted). Meanwhile, "[i]ssue preclusion, in contrast, bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim." *Id.* (citation omitted). Both of these doctrines have the effect of "precluding parties from contesting matters that they have had a full and fair opportunity to litigate." *Id.* (citation omitted).

▆▆▆ "A person who was not a party to a suit generally has not had a 'full and fair opportunity to litigate' the claims and issues settled in that suit," and therefore, a person is not bound by a judgment "in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." *Id.* (citation omitted). The Supreme Court has, however, enumerated six exceptions to this gen-

---

**52.** Alternatively, the Kentucky Defendants contend on appeal that the Bankruptcy Court has failed to comply with 28 U.S.C. § 1963, which provides:

A judgment in an action for the recovery of money or property entered in any ... district court ... may be registered by filing a certified copy of the judgment in any other district.... A judgment so registered shall have the same effect as a judgment of the district court of the district where registered and may be enforced in like manner. 28 U.S.C. § 1963. This statute has no bearing, however, on whether *res judicata* applies in order to bar defendants in a subsequent proceeding from contesting liability or damages based on the results of a previous pro-

ceeding. As such, the Kentucky Defendants' discussion of § 1963 does not appear relevant to their arguments that the Bankruptcy Court should have held that the UK Defendants were estopped from contesting the amount of damages to be imposed against them.

**53.** The Kentucky Defendants also argue, in the alternative, that the Bankruptcy Court should have directly enforced the Kentucky Default Judgment against the UK Defendants following the Bankruptcy Court's holding that Brearly's corporate veil would be pierced. Because the Court reverses the decision to pierce Brearly's corporate veil, however, this alternative argument is moot.

eral "rule against nonparty preclusion." *Id.* at 2172. On appeal, the Kentucky Defendants assert that either of two *Taylor v. Sturgell* exceptions should apply. The first proffered exception dictates that a nonparty is bound by a prior judgment if that nonparty "assumed control over the litigation in which that judgment was rendered," *id.* at 2173 (citation omitted), and the second dictates that a party is bound where the nonparty is a "proxy," "agent," or "designated representative" of a "person who was a party to the prior adjudication." *Id.*

■■■■ Although the Kentucky Defendants presented their *res judicata* arguments to the Bankruptcy Court on summary judgment and again at trial, the *August 2009 Opinion* does not address this theory of recovery, instead concluding only generally that "the Kentucky Defendants overreach[ed]" in this respect. *In re Tyson,* 412 B.R. at 639. The Kentucky Defendants re-asserted their *res judicata* argument during post-trial motion practice, but the Bankruptcy Court concluded that "it would be an abuse of process for this Court simply to enforce the Kentucky [Default] [J]udgment against the U.K. defendants" given the fact that Straight–Out had "signed all of the recovery proved in this case to Tyson." The Bankruptcy Court also stated during oral argument at the summary judgment stage, in reference to the potential preclu-

sive effect of the Kentucky Default Judgment, that "the doctrine of res judicata requires a final judgment on the merits, which we do not have in this case." [54]

Because the Bankruptcy Court did not clearly address the question of whether the Kentucky Default Judgment may preclude the UK Defendants from contesting liability and/or damages on the Kentucky Defendants' cross-claims pursuant to either of the proffered *Taylor v. Sturgell* exceptions, the Court declines to determine in the first instance whether either of these exceptions applies. On remand, the Bankruptcy Court shall determine, notwithstanding evidence that the Kentucky Court may have been mistaken in calculating the amount of damages, whether the Kentucky Defendants are entitled to use claim preclusion and/or offensive issue preclusion to enforce the Kentucky Default Judgment against the UK Defendants in the Adversary Proceeding.

### B. Rule 15(b)(2) & Rule 54 Motions

Second, the Kentucky Defendants assert that the Bankruptcy Court should have "[e]ither *sua sponte* or as a result of [their] post-Opinion motion" amended the Kentucky Defendants' pleading to include a fraud cross-claim against the UK Defendants. The Kentucky Defendants observe that "[t]he issue of fraud [was] litigated and actively contested" throughout the Adversary Proceeding based on the Plaintiff's

---

**54.** As a general statement of the law, this observation was in error. "[I]t has long been the law that default judgments can support *res judicata* [i.e., claim preclusion] as surely as judgments on the merits." *EDP Med. Computer Sys., Inc. v. U.S.,* 480 F.3d 621, 626 (2d Cir.2007) (citing *Morris v. Jones,* 329 U.S. 545, 550–51, 67 S.Ct. 451, 91 L.Ed. 488 (1947)). It is not clear, however, that claim preclusion is the right framework for understanding this dispute. If the Kentucky Defendants' theory is understood instead as relying upon offensive issue preclusion, then the fact

that the judgment was obtained by default will prevent recovery. The difference between claim preclusion and issue preclusion may be critical in this context, because "Judgment by default .... does not warrant issue preclusion for the very reason that the issues have not been litigated or decided." 18A Wright, Miller & Cooper, Fed. Prac. & Proc. § 4442; *see Faulkner v. Nat'l Geographic Enters. Inc.,* 409 F.3d 26, 37 (2d Cir.2005) (describing the requirements for applying offensive collateral estoppel).

own fraud claim against the UK Defendants and, therefore, that no unfair prejudice would result from such amendment. The Kentucky Defendants further interpret the *August 2009 Opinion* as making "obvious and clear findings of fact that fraud was *actually committed* by the UK [ ] Defendants against *both* the Plaintiff and [the Kentucky Defendants]—even using the word 'defrauded.' " The Kentucky Defendants assert that the court's factual findings represented "clear and convincing evidence" sufficient to satisfy the burden of proof as to each of the six elements of fraud under Kentucky law. *See Flegles, Inc. v. Truserv Corp.*, 289 S.W.3d 544, 549 (Ky.2009).

Following oral argument, the Bankruptcy Court concluded that the Kentucky Defendants' Rule 15(b)(2) and Rule 54 motions must be denied for at least three reasons. First, the Bankruptcy Court concluded that to add "a fraud claim or a claim for punitive damages .... would prejudice the defendants and would not be permitted." Second, the Bankruptcy Court found that, while the issue of fraud had indeed been litigated at trial, the Plaintiff had failed "to prove entitlement to either a fraud recovery or to punitive damages in its claim." [55] Third, the Bankruptcy Court again found that the Kentucky Defendants had not suffered any damages because they assigned away their rights to recovery from Brearly under the Distribution Agreement.

Although the Bankruptcy Court appears to have supported its ruling on the Rule 15(b)(2) and Rule 54 motions on independent grounds, it is nevertheless advisable to allow the Bankruptcy Court to revisit this issue on remand, given that the Bankruptcy Court must now address for the

first time the Plaintiff's fraud and unjust enrichment claims. Accordingly, the Court vacates the Bankruptcy Court's denial of the Kentucky Defendant's Rule 15(b)(2) and Rule 54 motions and remands for reconsideration without expressing any view as to whether the applications should be granted.

**C. Attorney's Fees**

Finally, the Kentucky Defendants assert that the Bankruptcy Court erred in refusing to award them attorney's fees under English law. In light of the disposition of the veil-piercing claim, however, this aspect of the Kentucky Defendant's appeal need not be addressed and is dismissed as moot.

### CONCLUSION

The October 27, 2009 final judgment of the Bankruptcy Court is vacated in part. The case is remanded for further proceedings consistent with this opinion.

SO ORDERED.

---

**55.** As discussed above, however, the Bankruptcy Court may simply have been expressing its view that the Plaintiff had proven no

right to damages beyond those he could recover under the breach-of-contract claim.